# DECLARATIONS

## AFB MEDIA TECH®

## PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, INFORMATION SECURITY & PRIVACY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY

**COVERAGE UNDER THIS POLICY IS PROVIDED ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE IX. OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Underwriters:** Syndicates 2623/623 at Lloyd's

**Policy Number:** W11DBA150501

**Authority Reference Number:** B6012BUSANMSL1501

Item 1. **Named Insured:** IAC/InterActiveCorp

    **Address:** 555 West 18th Street
                New York, NY 10011

Item 2. **Policy Period:**

    **From:** 20-Aug-2015

    **To:** 20-Aug-2016

    Both dates at 12:01 a.m. Local Time at the Address stated in Item 1.

Item 3. **Limit of Liability:**

    A. **Policy Aggregate Limit of Liability**:         $15,000,000
       (Aggregate for all coverages combined, including **Claims Expenses**) but sublimited to:

    B. Aggregate sublimit of liability applicable to Insuring     $2,000,000
       Agreement D. (Privacy Notification Costs):

    C. Aggregate sublimit of liability applicable to Insuring     $3,000,000
       Agreement E. (Regulatory Defense and Penalties):

    The above sublimits of liability are part of, and not in addition to, the overall **Policy Aggregate Limit of Liability**.

**Exhibit A**

Item 4.  **Retentions:**

    A.  Each **Claim Retention** (including each **Claim** in the form of a **Regulatory Proceeding**), includes **Claims Expenses**:      $1,000,000

    B.  Insuring Agreement D. (Privacy Notification Costs)

       Each incident, event or related incidents or events giving rise to an obligation to pay **Privacy Notification Costs**:      $500,000

Item 5.  **Premium**    $535,000

Item 6.  **Retroactive & Continuity Dates:**

    A.  Retroactive Date      Full Prior Acts except:

           Ask Jeeves Entity – 30 June 2004

           Former Bull Dog Entity – 5 November 2002

           PeopleMedia – 1 August 2001

           Privacy Notification Costs covered under

           Insuring Clause I.D – 1 October 2007

           The Princeton Review – 18 May 2012

           Skyllzone – 23 August 2010

    B.  Continuity Date      20-Aug-2008

Item 7.  **Optional Extension Period:**

    A.  Premium for **Optional Extension Period:**    100% of the total premium as for the Policy

           150% of the total premium as for the Policy

           200% of the total premium as for the Policy

    B.  Length of **Optional Extension Period:**    12 Months

           24 Months

           36 Months

Item 8.  Notification under this Policy:

    (a) Beazley Group
    Attn:  Beth Diamond
    1270 Avenue of the Americas
    Suite 1200

New York, NY 10020
Tel: (646) 943-5900
Fax: (646) 378-4039
Email: tmbclaims@beazley.com

(b) All other notices under this Policy shall be given to
Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Tel: (860) 677-3700
Fax: (860) 679-0247
(All Claims should be reported in accordance with 8.(a) above)

Item 9.    Terrorism Coverage: N/A

Item 10.   Service of process in any suit shall be made upon:

Mendes & Mount LLP
750 7th Ave, #24
New York, NY 10019

Item 11.   Choice of Law: New York

Item 12.   Endorsements Effective At Inception:

| | | |
|---|---|---|
| 1. | E06794032015 | War And Civil War Exclusion with Cyber-Terrorism Carve-back |
| 2. | NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| 3. | NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 4. | E02804032011 | Sanction Limitation and Exclusion Clause |
| 5. | EIA027092013 | Additional Insured Endorsement |
| 6. | EIA005092011 | Scheduled Subsidiary Endorsement |
| 7. | EIA007092011 | Separate Deductible for User Generated Videos |
| 8. | EIA009102014 | Cyber Extortion Loss Endorsement |
| 9. | EIA010112011 | Scheduled Person/Entity Exclusion |
| 10. | SCHEDULE2015 | Lloyd's Security Schedule |
| 11. | EIA011082012 | Amend Professional Services to Include Advertising Services |
| 12. | EIA012112015 | PCI Fines and Costs Endorsement |
| 13. | EIA013102012 | IAC Search Floor Endorsement |
| 14. | EIA015102012 | Amend Professional Services To Include Administrative Services For LLC |
| 15. | EIA017022013 | Merchandising Activities Endorsement |
| 16. | EIA016102014 | Additional Insured With Separate Retroactive Dates Per Insuring Agr Tutor.com |
| 17. | EIA025092013 | Retention Erosion Endorsement |
| 18. | EIA032092014 | Additional Insured with Separate Retroactive Dates Per Insuring Agre Skyllzone |
| 19. | EIA031092014 | Additional Insured with Separate Retroactive Dates Per Insuring Agre The Princeton Review |
| 20. | E03381112011 | Scheduled Claims Exclusion |

Dated:    16-Nov-2015

At:    30 Batterson Park Road
       Farmington
       Connecticut 06032          by_____
       (the office of the Correspondent)    Beazley USA Services, Inc. (Correspondent)

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

### WAR AND CIVIL WAR EXCLUSION WITH CYBER TERRORISM CARVEBACK

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding anything to the contrary contained herein this Policy does not cover **Loss** or **Claim** directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of, or damage to property by or under the order of any government or public or local authority; provided, that this exclusion will not apply to **Cyber Terrorism**.

For purposes of this endorsement, "**Cyber Terrorism**" means the premeditated use of disruptive activities, or threat to use disruptive activities, against a computer system or network with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**


<u>**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**</u>


This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**


For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

<u>This Policy</u>* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

      (a)     with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)     resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

      (a)     the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)     the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)     the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)     any nuclear reactor,

(b)      any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## SANCTION LIMITATION AND EXCLUSION CLAUSE

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**[®]

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.  Clause III., **The Insured and the Insured Organization**, is amended to include Ticketmaster, Lending Tree, Interval International and HSN, and any past, present or future director, trustee or employee thereof, but only for **Claims** for any negligent act, error or omission of IAC that is otherwise covered under Insuring Agreements C., D., E. or F.

2.  Notwithstanding anything to the contrary contained in this Policy, in the event a **Claim** or incident triggers coverage under this Policy and under any other policy issued by the Underwriters, the Underwriters' liability under this Policy and such other policy combined shall not exceed the amount of the largest of the applicable Limits of Liability.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>SCHEDULED SUBSIDIARY ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.  Clause VI. Definitions Z. "**Subsidiary**" is amended to include the following entity(ies):

    People Media

2.  Solely with respect to the entity(ies) scheduled in paragraph 1. above:

    a.  the final paragraph of Clause VI. Definitions Z. "**Subsidiary**" is deleted;

    b.  Item 6. of the Declarations is deleted and replaced with the following:

        Item 6. Retroactive Date: 1 August 2001

    c.  Clause V. Exclusions B. is deleted and replaced with the following:

        B.  Arising out of or resulting from any act, error or omission committed prior to the effective date of this Endorsement:

            1.  if any member of the corporate risk management department or the General Counsel of the Named Insured on or before 1 August 2009 was aware of any act, error, omission or circumstance that might reasonably be expected to be the basis of a **Claim**; or

            2.  in respect of which any **Insured** has given notice of a circumstance which might lead to a **Claim** to the insurer of any other policy in force prior to the inception date of this Policy;

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**SEPARATE DEDUCTIBLE FOR USER GENERATED VIDEOS**</u>

This endorsement modifies insurance provided under the following:


**AFB MEDIA TECH**®


In consideration of the premium charged for the Policy, it is hereby understood and agreed that:


Each **Claim** for, arising out of or resulting from actual or alleged copyright infringement based upon **"User Generated Videos"** hosted by or posted on a website of the **Insured Organization** shall be subject to a USD 2,000,000 Each **Claim** Deductible.

**"User Generated Videos"** means digital videos created by a third party user of a website of the **Insured Organization**, not including digital videos created by employees or independent contractors of the **Insured Organization** acting on behalf of the **Insured Organization**.



_____
Authorized Representative

Effective date of this Endorsement: 20-Aug-2015
This Endorsement is attached to and forms a part of Policy Number: W11DBA150501
Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"

## CYBER EXTORTION LOSS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

1.      Clause **I. INSURING CLAUSES** is amended by the addition of the following:

      E.      **Cyber Extortion Loss**

          To indemnify the Named Insured for **Cyber Extortion Loss**, in excess of the Deductible, as a direct result of:

          A.      the **Insured Organization** having first received, directly or indirectly, during the **Policy Period** an illegal threat or connected series of threats by a person other than an **Employee** or a person in collusion with an **Employee** to:

              1.      damage, delete or corrupt **Computer Data** on **Computer Systems**;

              2.      prevent access to **Computer Systems,** including a denial of service attack;

              3.      perpetrate a **Theft of Data** from **Computer Systems** through external access; or

              4.      introduce **Malicious Code** into **Computer Systems**;

          and which person then demands a **Ransom** as a condition of not carrying out such threats; or

          B.      a person, other than an **Employee** or a person in collusion with an **Employee** illegally encrypting **Computer Data** on **Computer Systems** and then first demanding during the **Policy Period** a **Ransom** as a condition of providing the **Insured Organization** with the decryption key, or other means of accessing the **Computer Data**.

          Provided however that such threat or demand must be reported to Underwriters in compliance with Clause **XXVIII. OBLIGATIONS OF THE INSURED IN THE EVENT OF CYBER EXTORTION** of this Policy.

2.      The coverage under this endorsement shall not apply to any:

      A.      **Cyber Extortion Loss** arising out of any threat to physically harm any person, or any threat to harm, take, or transfer property other than **Computer Data**, even if such threat is made in conjunction with a threat to **Computer Data**, or if by carrying out such a threat, **Computer Data** also may be damaged, corrupted, taken, disseminated or transferred;

      B.      **Cyber Extortion Loss** caused by or resulting from any matter, fact, situation or circumstance known to the **Insured** prior to 20 August 2011 and which matter, fact, situation or circumstance reasonably could have expected to cause or result in a loss;

C.      Surrender of **Ransom** where the demand for **Ransom** is made unless brought to such location after receipt of the **Ransom** demand for the sole purpose of paying the **Ransom**.

3.      Wherever used in this endorsement in bold face type and for the purposes of this endorsement only, the following definitions apply:

A.      "**Computer Data**" means data, including computer programs, the **Insured Organization** legally owns or licenses, or for which it is responsible, stored in electronic form on **Computer Systems**.

B.      "**Cyber Extortion Loss**" means:

1.      **Ransom** which has been surrendered under duress by or on behalf of the **Insured Organization** with Underwriters prior written consent, but solely to terminate an extortion threat that would result in a **Claim** for **Damages** against the **Insured** if such threat were carried out;

2.      The loss in transit by actual destruction, disappearance or wrongful abstraction in transit of any **Ransom** otherwise qualifying as **Cyber Extortion Loss** under paragraph 1. above while being conveyed to those persons requiring payment of a **Ransom** by any person authorized by or on behalf of the **Insured Organization** to make such conveyance; and

3.      Fees and expenses paid by or on behalf of the **Insured Organization** for security consultants retained with Underwriter's prior written approval, but solely to prevent or terminate an extortion threat.

C.      "**Employee**" means:

1.      any person, including officers and partners, employed in the regular service of the **Insured Organization** in the ordinary course of the **Insured Organization's** business whom the **Insured Organization** is entitled to govern and direct in the performance of such service and compensates by way of salary, wages and/or commission;

2.      any director or trustee of the **Insured Organization**;

3.      any person serving as a non-compensated officer of the **Insured Organization**;

4.      any independent contractor, temporary employee or intern of the **Insured Organization**; or

5.      any person who was formerly an **Employee** as defined in paragraphs 1, 2, 3, or 4 of this Definition prior to the termination of his or her services, but only for a period of ninety (90) days following such termination.

D.      "**Ransom**" means cash, marketable goods or services surrendered by or on behalf of the **Insured Organization** to meet a threat covered by Clause **I. INSURING CLAUSES** E. **Ransom** shall not include the value of cash, goods or services that exceeds the covered **Damages** and **Claims Expens**es that the **Insured Organization** would have incurred had the **Ransom** not been paid.

4.      The Insurers maximum **Limit of Liability** for all **Cyber Extortion Loss** shall be USD 5,000,000 (the "**Cyber Extortion Loss Sublimit**") excess of USD 1,000,000.  This limit shall be a part of, not in addition to the Limit of Liability shown in Item 3.b. of the Declaration.

5.      This Policy is amended by the addition of the following:

**XXVIII.  OBLIGATIONS OF THE INSURED IN THE EVENT OF CYBER EXTORTION**

   A.  **Notification of Underwriters**

   In the event of a demand for **Ransom** to which this Policy applies, the Named Insured shall immediately notify the persons named in Item 8 (a) of the Declarations by telephone and shall thereafter provide written notice by telecopy or express mail within five days (5) following the demand to the persons named in Item 8 (a) of the Declarations.

   B.  **Insured's Duty of Confidentiality**

   The **Insured Organization** shall use its best efforts at all times to ensure that knowledge regarding the existence of the extortion coverage afforded by this Policy is kept confidential.  Underwriters may cancel this endorsement upon ten (10) days written notice to the Named Insured if the existence of the cyber extortion coverage provided by this endorsement becomes public knowledge through no fault of Underwriters.

   C.  **Insured Organization's Obligation to Investigate Ransom Demand and Avoid or Limit Payment.**

   Prior to the payment of any **Ransom**, the **Insured Organization** shall make every reasonable effort to determine that the threat is not a hoax.

   The **Insured Organization** shall take all steps reasonable and practical to avoid or limit the payment of **Ransom**.

   D.  **Named Insured's Obligation to Demonstrate Duress**

   As a condition to payment of any **Ransom** under the terms of this Policy, the Named Insured must be able to demonstrate that such **Ransom** was surrendered under duress.

   E.  **Notification of Police**

   The **Insured Organization** shall allow Underwriters or their representative to notify the police or other responsible law enforcement authorities of any loss or demand for **Ransom**.

**XXIX.      RECOVERED PROPERTY**

   If the **Insured** or Underwriters recover any property, money or securities after a loss payment is made, the party making the recovery must give prompt notice of the recovery to the other party.  If the recovered property is money or other funds, the recovery shall be applied first to any costs incurred by Underwriters in recovering the property, second to loss payments made by Underwriters, and third to any deductible payment made by the Named Insured.  If property other than money or funds is recovered, then the Named Insured may keep the recovered property and return the loss payment, plus the any costs

of recovery incurred by Underwriters, or keep the loss payment less the costs of recovery incurred by Underwriters and transfer all rights in the property to Underwriters.

6.    For the purposes of this endorsement only, Clause **XVI. MERGERS AND ACQUISITIONS** is amended by the addition of the following:

Notwithstanding the above, this Policy will not apply to a **Cyber Extortion Loss** in the event of a merger, acquisition, or consolidation to which this section applies unless the Named Insured has provided notice as required by the Policy, obtained consent from Underwriters and paid any additional premium required by Underwriters.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## SCHEDULED PERSON/ENTITY EXCLUSION

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that SSL Assets LLC dba Sendori Inc. is not an **Insured** under this Policy; provided, however, that all other **Insureds** shall continue have coverage for any otherwise-covered **Damages, Privacy Notification Costs, Penalties** or **Claims Expenses** for, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged act, error or omission, or any breach of contract, by SSL Assets LLC dba Sendori Inc. that occurred prior to 10-Nov-2011.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



**LLOYD'S SECURITY SCHEDULE**

Syndicate 2623     82%
Syndicate 623      18%

ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>AMEND PROFESSIONAL SERVICES TO INCLUDE ADVERTISING SERVICES</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**[®]

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause VI. Definitions V. "**Professional Services**" is amended by adding the following to the end thereof:

Provided however, "**Professional Services**" also means advertising services performed solely by Felix Calls LLC for others.

Solely with respect to the **Professional Services** provided in this endorsement, the Retroactive Date set forth in Item 6. of the Declarations shall be 15 August 2012.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Effective date of this Endorsement: 20-Aug-2015
This Endorsement is attached to and forms a part of Policy Number: W11DBA150501
Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"

<u>**PCI FINES AND COSTS ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Item 3. of the Declarations is amended to include the following:

   D.      Aggregate sublimit of liability applicable to Insuring Clause PCI-      $500,000
           A. (PCI Fines and Costs):

2.      Item 4. of the Declarations is amended by the addition of:

   C.      $1,000,000      Each **Claim Retention** - applicable to Insuring Agreement PCI-A. for
                           **PCI Fines and Costs**

3.      Insuring Agreement D. is deleted in its entirety and replaced with the following:

   D.      **Privacy Notification Costs**

           To indemnify the **Named Insured** for:

           **Privacy Notification Costs**, in excess of the Deductible and incurred by the **Insured
           Organization** with Underwriters' prior written consent, resulting from the **Insured
           Organization's** legal obligation to comply with a **Breach Notice Law** because of an
           incident (or reasonably suspected incident) described in Insuring Clause C.1. or C.2. that
           first takes place on or after the **Retroactive Date** and before the end of the **Policy
           Period**; provided such incident or suspected incident must be reported to Underwriters
           during the **Policy Period**.

           **Privacy Notification Costs** means reasonable and necessary:

           (a)      costs to hire a computer security expert to determine the existence and cause of
                    any electronic data breach resulting in an actual or reasonably suspected theft,
                    loss or **Unauthorized Disclosure** of information;

           (b)      costs to provide notification in compliance with a **Breach Notice Law** or credit
                    card association operating regulations;

           (c)      costs to hire a PCI Forensic Investigator that is approved by the PCI Security
                    Standards Council and is retained by the **Insured Organization** in order to
                    comply with the terms of a **Merchant Services Agreement** to investigate the
                    existence and extent of an actual or suspected compromise of credit card data;
                    and in the Underwriters' discretion, where a computer security expert has not
                    been retained under Insuring Clause C.3.(a), for a computer security expert to
                    provide advice and oversight in connection with the investigation conducted by
                    the PCI Forensic Investigator;

(d) fees charged by an attorney to determine the applicability of and actions necessary by the **Insured Organization** to comply with **Breach Notice Laws** and to advise the **Insured Organization** in responding to credit card system operating regulation requirements for any actual or suspected compromise of credit card data that is required to be reported to the **Insured Organization's** merchant bank under the terms of a **Merchant Services Agreement**, but this clause does not cover fees incurred in any legal proceeding, arbitration or mediation, or any advice in responding to credit card system operating regulations after any assessment of **PCI Fines and Costs**;

(e) costs of a credit file monitoring and public relations program, to be approved by Underwriters, consisting of:

(1) the offering of one year of credit monitoring services to those individuals who **Personally Identifiable Non-Public Information** was compromised or reasonably believed to be compromised as a result of the theft or **Unauthorized Disclosure** of information giving rise to the notification requirement;

(2) mailing and other reasonable third party administrative costs associated with such program;

(3) costs of a public relations consultancy, not to exceed $250,000

Provided all such costs under subsection (e) must be incurred within one (1) year of discovery of such theft or **Unauthorized Disclosure** of information, must be for the purpose of mitigating potential **Damages** resulting from such theft or **Unauthorized Disclosure** of information, and are subject to twenty percent (20%) coinsurance; and

(f) Up to USD 50,000 for a computer security expert to demonstrate the **Insured's** ability to prevent a future electronic data breach as required by a **Merchant Services Agreement**;

provided amounts covered by (a), (b), (c), (d), (e) and (f) in this paragraph combined are part of and not in addition the Limits of Liability stated in Item 3. of the Declarations and shall not exceed the amount set forth in Item 3.D. of the Declarations in the aggregate for the **Policy Period**;

4. Clause I. Insuring Agreements is amended by the addition of:

PCI-A. **PCI Fines and Costs**

To indemnify the **Insured** for **PCI Fines and Costs**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** first made against any **Insured** during the **Policy Period** or **Extended Reporting Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause X. of this Policy. The Underwriters shall have no duty to defend any **Claim** or pay **Claims Expenses** with respect to any **Claim** under this Insuring Clause.

5.   The first paragraph of Clause V. Exclusions is deleted in its entirety and replaced with the following:

The coverage under this Insurance does not apply to **Damages**, **Penalties, Claims Expenses** or **PCI Fines and Costs** in connection with or resulting from any **Claim**, or to any **Privacy Notification Costs**:

6.   Clause VI. Definitions is amended to include the following:

PCI-A.   **Merchant Services Agreement** means any agreement between an **Insured** and a financial institution, credit/debit card company, credit/debit card processor or independent service operator enabling an **Insured** to accept credit card, debit card, prepaid card, or other payment cards for payments or donations.

PCI-B.   **PCI Fines and Costs** means the direct monetary fines, penalties, reimbursements, fraud recoveries or assessments owed by the **Insured Organization** under the terms of a **Merchant Services Agreement**, but only where such fines, penalties, reimbursements, fraud recoveries or assessments result both from the **Insured Organization's** actual or alleged noncompliance with published PCI Data Security Standards and from a data breach caused by an incident (or reasonably suspected incident) described in Insuring Agreement C.1. or C.2.; provided, that the term **PCI Fines, Expenses and Costs** shall not include or mean any charge backs, interchange fees, discount fees or prospective service fees.

7.   Clause VII. Limit of Liability is amended to include the following immediately before the penultimate paragraph thereof:

The sublimit of liability stated in Item 3.D. of the Declarations is the aggregate limit for the **Policy Period** for all **PCI Fines and Costs** covered under Insuring Agreement PCI-A.

8.   Clause VIII. Retention is amended by the addition of:

The Each **Claim Retention** amount set forth in Item 4.C. of the Declarations applies separately to each incident, event, or related incidents or events, giving rise to a **Claim**. The Each **Claim Retention** shall be satisfied by monetary payments by the **Named Insured** of **PCI Fines and Costs**.


All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## IAC SEARCH FLOOR ENDORSEMENT

This endorsement modifies insurance provided under the following:


**AFB MEDIA TECH**®


In consideration of the premium charged for the Policy, it is hereby understood and agreed that:


1.  Solely with respect to acts, errors, omissions, incidents or circumstances that arise out of or result from the operations of Search Floor, Inc. and which take place on or after the Retroactive Date set forth in section 2. below but prior to 20 August 2012, Item 3. of the Declarations is deleted in its entirety and replaced with the following:

    Item 3.      **Limit of Liability:**

           (a) $3,000,000 Each **Claim** – includes **Claims Expenses**

           (b) $3,000,000 Aggregate for the **Policy Period** – includes **Claims Expenses**

              (1) $1,000,000      Aggregate limit for the **Policy Period** for all **Privacy Notification Costs** covered under Insuring Clause I.C.3.

2.  Item 6. of the Declarations is amended by the addition of the following:

    Item 6.      **Retroactive Date:**

                                     Search Floor – 13 July 2005


All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**AMEND PROFESSIONAL SERVICES**
**TO INCLUDE ADMINISTRATIVE SERVICES FOR MPW, LLC**

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. Clause VI. Definitions, paragraph V. "**Professional Services**" is amended by adding the following to the end thereof:

   Provided however, that solely with respect to a **Claim** arising out of an act, error, omission or circumstance committed or occurring on or after 20 August 2012 and before 22 September 2012, "**Professional Services**" also means the following services performed solely for MPW, LLC by or on behalf of the **Insured Organization**:

   - Payroll services

   - Recruiting and hiring services

   - Benefits management services; and

   - Employee Support services.

2. Solely with respect to the **Professional Services** described above in this endorsement, the Retroactive Date set forth in Item 6. of the Declarations shall be 20 August 2012.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>MERCHANDISING ACTIVITIES ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for this Policy, it is hereby understood and agreed that solely with respect to the written agreement between Television Food Network, G.P. and Notional, LLC duly executed on 12 February 2013:

1.    Clause VI Definitions M. **Media Activities** is amended to include **Merchandising Activities.**

       **Merchandising Activities** means in connection with **Media Material:**

        a)  the use of any logo, symbol, trademark or other intellectual property, lawfully owned or licensed by the **Insured**, in connection with the sale of goods or services; or

        b)  the licensing to any third party of any logo, symbol, trademark or other intellectual property, lawfully owned or licensed by the Insured, for use in connection with the sale of goods or services.

2.    Clause V.  Exclusions is hereby amended to include the following:

       For or arising out of or resulting from:

        1.  the breach of any express or implied warranty or guarantee, or breach of fiduciary relationship, in connection with the sale of goods or services; or

        2.  any actual or alleged malfunction of any product, or failure of any product to perform in any manner, as a result of any defect in the design or manufacture of such product, including but not limited to any actual or alleged **Bodily Injury** or **Property Damage** resulting therefrom.

3.    The aggregate limit of liability for all **Claims**, **Damages** and **Claims Expenses** for, arising out of, or resulting from **Merchandising Activities** shall be USD 1,000,000 in excess of an Each **Claim** Deductible of USD 1,000,000; and such limit of liability is part of, and not in addition to, the Each **Claim** Limit of Liability stated in Item 3.(a) of the Declarations and the "Aggregate for the Policy Period" stated in Item 3.(b) of the Declarations.

All other terms and conditions of this policy remain unchanged.

_____
               Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**ADDITIONAL INSURED WITH SEPARATE RETROACTIVE DATES PER INSURING AGREEMENT**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH®**

In consideration of an additional premium charged for this policy, it is hereby understood and agreed that:

1. Clause III. The Insured and the Insured Organization, paragraph A is amended to include Tutor.com, Inc. as part of the **Insured Organization**;

2. With respect to all **Claims**, **Damages**, **Claims Expenses**, **Penalties**, **Privacy Notification Costs** and **PCI Fines and Costs** that arise out of or relate to Tutor.com, Inc.'s acts or operations, Item 6. of the Declarations is amended to include:

| <u>Entity</u> | <u>Retroactive Date</u> | |
|---|---|---|
| Tutor.com, Inc. | Insuring Clause A. | 4 November 2005 ($2,000,000); and 14 December 2012 ($13,000,000 excess $2,000,000) |
| | Insuring Clause B. | 4 November 2005 ($2,000,000); and 14 December 2012 ($13,000,000 excess $2,000,000) |
| | Insuring Clause C.1. | 4 November 2005 ($2,000,000); and 14 December 2012 ($13,000,000 excess $2,000,000) |
| | Insuring Clause C.2. | 4 November 2005 ($2,000,000); and 14 December 2012 ($13,000,000 excess $2,000,000) |
| | Insuring Clause C.3. | 14 December 2012 |
| | Insuring Clause C.4. | 14 December 2012 |
| | Insuring Clause D. | 4 November 2005 ($2,000,000); and 14 December 2012 ($13,000,000 excess $2,000,000) |
| | Insuring Clause PCI-A. | 14 December 2012 |

3. Solely with respect to the acts or operations of Tutor.com, Inc., Clause VI., Definitions, paragraph V. "Professional Services" is amended to include online tutoring services.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>RETENTION EROSION ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH<sup>®</sup>**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that any retention payments by the Insured or any payments by Continental Casualty Company under the Enterprise Media Solutions Policy Number 592410592 shall be deemed to apply to the retention obligations under this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**ADDITIONAL INSURED WITH SEPARATE RETROACTIVE DATES PER INSURING AGREEMENT – SKYLLZONE**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged, it is hereby understood and agreed that:

1.   Solely with respect to Skyllzone, Item 3. of the Declarations is deleted in its entirety and replaced with the following:

      Item 3.      Limit of Liability:

            (a) $1,000,000 Each **Claim** – Includes **Claims Expenses**

            (b) $1,000,000 Aggregate for the **Policy Period** – includes **Claims Expenses**

2.   Clause **III. THE INSURED AND THE INSURED ORGANIZATION**, paragraph A is amended to include Skyllzone as part of the **Insured Organization**.

2.   With respect to all **Claims**, **Damages**, **Claims Expenses**, **Penalties**, **Privacy Notification Costs** and **PCI Fines and Costs** that arise out of or relate to Skyllzone's acts or operations, Item 6.A. is deleted in its entirety and replaced with the following:

      Item 6.A.      Retroactive Date:  23 August 2010

3.   Solely with respect to the acts or operations of The Princeton Review, Clause **VI. DEFINITIONS**, paragraph DD. "**Professional Services**" is amended to include educational consulting services, including test preparation services, supplemental education services, admissions services and franchising services.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**ADDITIONAL INSURED WITH SEPARATE RETROACTIVE DATES PER INSURING AGREEMENT –**
**THE PRINCETON REVIEW**</u>

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged, it is hereby understood and agreed that:

1.    Clause **III. THE INSURED AND THE INSURED ORGANIZATION**, paragraph A is amended to include The Princeton Review as part of the **Insured Organization**;

2.    With respect to all **Claims**, **Damages**, **Claims Expenses**, **Penalties**, **Privacy Notification Costs** and **PCI Fines and Costs** that arise out of or relate to The Princeton's Review's acts or operations, Item 6.A. of the Declarations is amended to include:

| <u>Entity</u> | <u>Retroactive Date</u> |
| --- | --- |
| The Princeton Review | 18 May 2012 |

3.    Solely with respect to the acts or operations of The Princeton Review, Clause **VI. DEFINITIONS**, paragraph DD. "**Professional Services**" is amended to include educational consulting services, including test preparation services, supplemental education services, admissions services and franchising services.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 20-Aug-2015**
**This Endorsement is attached to and forms a part of Policy Number: W11DBA150501**
**Syndicate 2623/623 at Lloyd's referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

### SCHEDULED CLAIMS EXCLUSION

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause V. Exclusions is amended by the addition of the following:

SC-A.   against an Insured based upon, arising from, in consequence of, relating to, or in any way involving any circumstance(s) set forth below:

excludes claims brought arising out of, or as a result of the following pending matters disclosed as part of the underwriting of this risk: ITC v. TPR Education LLC, Penn Foster litigation; Theodore Silver litigation; Kaplan, Inc. litigation; Adam Robinson v. Laura Day et al.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



# Lloyd's Insurance

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Underwriters.** The Correspondent is not an Underwriter hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Underwriters hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

5. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

6. It is hereby understood and agreed that wherever the word 'Policy' appears herein it shall be deemed to read 'Certificate.'



**AFB MEDIA TECH® FOR IAC**

**PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, INFORMATION SECURITY & PRIVACY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**

**NOTICE: COVERAGE UNDER THIS POLICY IS PROVIDED ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE IX. OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the **Named Insured**, set forth in Item 1. of the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the **Application** to this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to all the provisions, terms and conditions of this Policy:

I.      **INSURING AGREEMENTS**

    A.      **Professional and Technology Based Services Liability**

        To pay on behalf of any **Insured**:

        **Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, arising out of any negligent act, error, omission, misstatement or misleading statement, or any unintentional breach of contract, in rendering or failure to render **Professional Services** or **Technology Based Services** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** by the **Insured** or by any person for whose negligent act, error, omission, misstatement or misleading statement, or unintentional breach of contract the **Insured Organization** is legally responsible.

    B.      **Technology Products Liability**

        To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, arising out of:

1. any negligent act, error or omission, or any unintentional breach of contract, by the **Insured** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** that results in the failure of **Technology Products** to perform the function or serve the purpose intended; or

2. infringement of copyright committed by the **Insured** on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** with respect to software **Technology Products**.

C. **Information Security & Privacy Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a **Privacy Law**, first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, for:

1. theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** that is in the care, custody or control of the **Insured Organization**, or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** the **Insured Organization** is legally responsible (a third party shall include a Business Associate as defined by the Health Insurance Portability and Accountability Act ("HIPAA")), provided such theft, loss or **Unauthorized Disclosure** first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**;

2. one or more of the following acts or incidents that directly result from a failure of **Computer Security** to prevent a **Security Breach**, provided that such act or incident first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**;

   (a) the alteration, corruption, destruction, deletion, or damage to a **Data Asset** stored on **Computer Systems**;

   (b) the failure to prevent transmission of **Malicious Code** from **Computer Systems** to **Third Party Computer Systems**;

or

(c) the participation by the **Insured Organization's Computer System** in a **Denial of Service Attack** directed against a **Third Party Computer System**;

3. the **Insured Organization's** failure to timely disclose an incident described in C.1 or C.2. above in violation of any **Breach Notice Law**; provided such incident giving rise to the **Insured Organization's** obligation under a **Breach Notice Law** must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**;

4. failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

(a) prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of a person's **Personally Identifiable Non-Public Information**;

(b) requires the **Insured Organization** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by a person;

(c) mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**;

(d) prevents or prohibits improper or intrusive collection of **Personally Identifiable Non-Public Information** from a person;

(e) requires notice to a person of the **Insured Organization's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Non-Public Information**; or

(f) provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Insured Organization's** collection or use his or her **Personally Identifiable Non-Public Information**;

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**, and the **Insured Organization** must, at the time of such acts, errors or omissions, have in force a **Privacy Policy** that directly addresses those subsections above that are relevant to such **Claim**; or

5. failure by the **Insured** to administer (a) an identity theft prevention program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681m(e), as amended, or (b) an information disposal program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681W, as amended; provided the acts, errors or omissions that constitute such failure must first take place on or after the **Retroactive Date** and before the end of the **Policy Period**.

D. **Privacy Notification Costs**

To pay the **Named Insured** for:

**Privacy Notification Costs**, in excess of the **Retention** and incurred by the **Insured Organization** with the Underwriters' prior written consent, resulting from the **Insured Organization's** legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement C.1. or C.2. that first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**, is discovered by the **Insured** during the **Policy Period**, and is reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy.

**Privacy Notification Costs** means the following reasonable and necessary costs incurred by the **Insured Organization** within one (1) year of the reporting of the incident or suspected incident to the Underwriters:

1. to hire a computer security expert to determine the existence and cause of any electronic data breach resulting in an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** which may require the **Insured Organization** to comply with a **Breach Notice Law** and to determine the extent to which such information was accessed by an unauthorized person or persons; and for fees charged by an attorney to determine the applicability of and actions necessary by the **Insured Organization** to comply with **Breach Notice Law** due to an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**;

2. to provide notification to:

   (a) individuals who are required to be notified by the applicable **Breach Notice Law**; and

   (b) in the Underwriters' discretion, to individuals affected by an incident in which their **Personally Identifiable Non-Public Information** has been subject to theft, loss, or **Unauthorized Disclosure** in a manner which compromises the security or privacy of such individual by

posing a significant risk of financial, reputational or other harm to the individual;

3.　　up to one hundred thousand United States dollars (USD 250,000) for the costs of a public relations consultancy for the purpose of averting or mitigating material damage to the **Insured Organization's** reputation, subject to twenty percent (20%) coinsurance; and

4.　　in connection with a credit file monitoring program, to be approved by the Underwriters, consisting of:

　　(a)　　the offering of one (1) year of credit monitoring services to those individuals whose **Personally Identifiable Non-Public Information** was compromised or reasonably believed to be compromised as a result of theft, loss or **Unauthorized Disclosure** of information giving rise to the notification of such individuals pursuant to Insuring Agreement D.2.; and

　　(b)　　mailing and other reasonable third party administrative costs associated with such a program;

provided, all such costs payable under this subsection 4. must be for the purpose of mitigating potential **Damages** resulting from such incident.

**Privacy Notification Costs** will be paid in excess of the applicable **Retention** and shall not include any internal salary or overhead expenses of the **Insured Organization**.

E.　　**Regulatory Defense and Penalties**

To pay on behalf of the **Insured**:

**Claims Expenses** and **Penalties** in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding**, first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, resulting from a violation of a **Privacy Law** and caused by an incident described in Insuring Agreement C.1., C.2. or C.3 that first takes place on or after the **Retroactive Date** and before the end of the **Policy Period.**

F.　　**Multimedia and Advertising Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** during the **Policy Period** or **Optional Extension Period** (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, for one or more of the following acts first committed on or after the **Retroactive Date** set forth in Item 6.A. of the Declarations and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**:

1.  defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.  invasion of or interference with the right to privacy or of publicity;

3.  misappropriation of any name or likeness for commercial advantage;

4.  false arrest, detention or imprisonment;

5.  invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;

6.  plagiarism, piracy or misappropriation of ideas under implied contract;

7.  infringement of copyright;

8.  infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark;

9.  negligence regarding the content of any **Media Communication**, including harm caused through any reliance or failure to rely upon such content;

10. misappropriation of trade secret; or

11. unfair competition, but only if alleged in conjunction with any of the acts listed in paragraphs 7. or 8. above.

provided, Insuring Agreements A., B., C., D., E. and F. of this Insurance shall not apply to any **Claim** for or arising out of the disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person prior to the date he or she became an employee, officer, director, **Manager**, principal or partner of the **Insured Organization**.

## II.    DEFENSE AND SETTLEMENT OF CLAIMS

A. The Underwriters shall have the right and duty to defend, subject to all the provisions, terms and conditions of this Policy:

1. any **Claim** against the **Insured** seeking **Damages** which are payable under the terms of this Policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent;

2. any **Claim** in the form of a civil suit against the **Insured** that seeks injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction) for one or more of the acts listed in Insuring Agreement F. if:

   (a) the **Claim** is first made and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable); and

   (b) the act or acts were committed on or after the **Retroactive Date** and before the end of the **Policy Period** in the course of the **Insured's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**.

3. under Insuring Agreement E., any **Claim** in the form of a **Regulatory Proceeding**.

Defense counsel shall be mutually agreed upon between the **Named Insured** and the Underwriters but, in the absence of such agreement, the Underwriters' decision shall be final.

B. With respect to any **Claim** against the **Insured** seeking **Damages** or **Penalties** which are payable under the terms of this Policy, the Underwriters will pay **Claims Expenses** incurred with their prior written consent. The Limit of Liability available to pay **Damages**, **Penalties**, or **Privacy Notification Costs** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages**, **Penalties**, and **Claims Expenses** shall be applied against the **Retention** payable by the **Insured**.

C. If the **Insured** shall refuse to consent to any settlement or compromise recommended by the Underwriters and acceptable to the claimant and elects to contest the **Claim**, the Underwriters' liability for any **Damages**, **Penalties** and **Claims Expenses** shall not exceed:

1. the amount for which the **Claim** could have been settled, less the remaining **Retention**, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2. fifty percent (50%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus fifty percent (50%) of any **Damages** above the amount for which the **Claim** could have been settled. The remaining fifty percent (50%) of such **Claims Expenses** and

**Damages** must be borne by the **Insured** at their own risk and uninsured;

or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Insured**. The portion of any proposed settlement or compromise that requires the **Insured** to cease, limit or refrain from actual or alleged infringing or otherwise injurious activity or is attributable to future royalties or other amounts that are not **Damages** (or **Penalties** for **Claims** covered under Insuring Agreement E.) shall not be considered in determining the amount for which a **Claim** could have been settled.

D.    The Underwriters agree that the **Insured** may settle any **Claim** where the **Damages** and **Claims Expenses** do not exceed fifty percent (50%) of the **Retention**, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all the **Insureds** from all claimants.

## III.    THE INSURED AND THE INSURED ORGANIZATION

As used throughout this Policy, whether expressed in singular or plural, "**Insured**" shall mean:

A.    The **Named Insured**, any **Subsidiaries** of the **Named Insured** and and MPW, LLC (together the "**Insured Organization**");

B.    A director, officer or **Manager** of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

C.    An employee (including a part time, temporary, leased or seasonal employee) of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

D.    A principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

E.    Any person who previously qualified as an **Insured** under III.B., III.C. or III.D. above prior to the termination of the required relationship with the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

F.    The estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance;

G.    The lawful spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law

in the United States, of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner; and

H.   An **Additional Insured**, but only as respects the vicarious liability of such person or entity for negligent acts, errors or omissions of the **Named Insured**.

## IV.   TERRITORY

This Insurance applies to **Claims** made and acts, errors or omissions committed, or **Loss** occurring anywhere in the world.

## V.   EXCLUSIONS

The coverage under this Insurance does not apply to any **Claim** or **Loss**:

A.   Arising out of or resulting from any criminal, dishonest, fraudulent, or malicious act, error or omission, any intentional **Security Breach**, intentional violation of a **Privacy Policy**, or intentional or knowing violation of the law, if committed by any **Insured**, or by others if such **Insured** colluded or participated in any such conduct or activity; provided, this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the **Insured**, or written admission by the **Insured**, establishing such conduct, or a plea of *nolo contendere* or no contest regarding such conduct, at which time the Named Insured shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses**;

provided further, that whenever coverage under this Insurance would be excluded, suspended or lost because of this exclusion relating to acts or violations by any **Insured**, and with respect to which any other **Insured** did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge thereof, then the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall cover and be paid with respect to those **Insureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts, errors or omissions described in the immediately preceding paragraph; however this exception to exclusion A. is inapplicable to any **Claim** arising from acts, errors or omissions known to any present or former member of the **Control Group**;

B.   For, arising out of or resulting from any act, error, omission, incident, failure of **Computer Security**, or **Security Breach** committed or occurring prior to the inception date of this Policy:

1.   if any member of the corporate risk management department or the General Counsel of the **Named Insured** on or before the

**Continuity Date** knew or could have reasonably foreseen that such act, error, omission, or incident, failure of **Computer Security**, or **Security Breach** might be expected to be the basis of a **Claim** or **Loss**; or

2. in respect of which any **Insured** has given notice of a circumstance, which might lead to a **Claim** or **Loss**, to the insurer of any other policy in force prior to the inception date of this Policy;

C. For, arising out of or resulting from any related or continuing acts, errors, omissions, incidents or events where the first such act, error, omission, incident or event was committed or occurred prior to the **Retroactive Date** set forth in Item 6.A. of the Declarations;

D. For or arising out of or resulting from **Bodily Injury** or **Property Damage**; provided, this exclusion shall not apply to any **Claim** for **Contingent Bodily Injury and/or Property Damage**.

For the purpose of this exclusion, the term "**Contingent Bodily Injury and/or Property Damage**" means those **Claims** wherein the **Damages** sought by the claimant are for **Bodily Injury** and/or **Property Damage** which arise solely out of:

1. any negligent act, error or omission in rendering or failure to render **Professional Services** or **Technology Based Services**; or

2. any one or more of the acts listed in Insuring Agreement F. in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**

which is otherwise covered under the terms and conditions of this Policy; but not if the **Insured's** own act, error or omission is the direct immediate cause of such **Claim** for **Bodily Injury** and/or **Property Damage**. Furthermore, this extension of coverage applies only if such **Claim** for **Bodily Injury** and/or **Property Damage** is not covered under any other policy of insurance;

As a condition of the application of this exception to Exclusion D., the Named Insured shall maintain during the term of this Policy a Commercial General Liability policy including Products and Completed Operations with minimum limits of liability of USD 10,000,000 applying to all of the **Insured Organization's** business, and any coverage under this Policy is excess to the coverage provided or which should have been provided by such Commercial General Liability policy.

E. For, arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement either oral or written; provided, however, that this exclusion will not apply:

1. with respect to (a) Insuring Agreement A., for breach of an agreement by the **Insured Organization** to perform **Professional Services** or **Technology Based Services**; or (b) Insuring Agreement B., for breach of an agreement by the **Insured Organization** to manufacture, develop, create, distribute, license, lease or sell **Technology Products**; provided, this exception shall not apply to liability assumed in any hold harmless or indemnity agreement, other than a hold harmless or indemnity agreement with respect to intellectual property rights or breaches of the confidentiality of information of any third party;

2. with respect to Insuring Agreement C.1., to any obligation to maintain the confidentiality or security of **Personally Identifiable Non-Public Information** or of **Third Party Corporate Information**;

3. with respect to Insuring Agreement F., for liability:

   (a) **Assumed under Contract**; or

   (b) misappropriation of ideas under an implied contract; or

4. to the extent the **Insured** would have been liable in the absence of such contract or agreement;

F. For or arising out of or resulting from:

1. breach of any express warranty or representation except for an agreement to perform within a reasonable standard of care or skill consistent with applicable industry standards, or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care or skill as is consistent with applicable industry standards;

2. breach of guarantee or any promises of cost savings, profits, or return on investment; or

3. delay in delivery or performance, or failure to deliver or perform at or within an agreed upon period of time, but this exclusion shall not apply if such delay or failure to deliver or perform is a consequence of a negligent act, error or omission committed during the course of providing **Professional Services** or **Technology Based Services** if the **Insured** has made diligent efforts to deliver or perform such **Professional Services** or **Technology Based Services**;

G. For, arising out of or resulting from:

1. inaccurate, inadequate, or incomplete description of the price of goods, products or services;

2. cost guarantees, cost representations, or contract price estimates of probable costs or cost estimates actually or allegedly being exceeded;

3. the failure of goods, products, or services to conform with any represented quality or performance contained in **Advertising**; or

4. any actual or alleged gambling, contest, lottery, promotional game or other game of chance; provided that this exclusion G.4. shall not apply to:

    (a) the **Insured Organization's** written agreement between:

        (i) Connected Ventures and The Coca Cola Company, duly executed on 18 March 2009; and

        (ii) Connected Ventures and Paramount Home Entertainment Inc., duly executed on 27 February 2014; or

    (b) acts or errors committed, or omissions, incidents or circumstances occurring, in the course of Skyllzone LLC's business operations;

H. Arising out of or resulting from any actual or alleged obligation to make licensing fee or royalty payments, including but not limited to the amount or timeliness of such payments;

I. For, arising out of or resulting from any costs or expenses incurred or to be incurred by the **Insured** or others for:

1. the reprinting, recall, removal or disposal of any **Media Material**, including any media or products containing such **Media Material**; or

2. the withdrawal, recall, inspection, repair, replacement, reproduction, removal or disposal of:

    (a) **Technology Products**, including any products or other property of others that incorporate **Technology Products**;

    (b) work product resulting from or incorporating the results of **Professional Services** or **Technology Based Services**; or

    (c) any products or other property on which **Professional Services** or **Technology Based Services** are performed;

however, this exclusion shall not apply to third party **Claims** for the resulting loss of use of such **Media Material** or **Technology Products**, or loss of use of the work product resulting from such **Professional Services** or **Technology Based Services**;

J.    For, arising out of, resulting from:

    1.    any failure or malfunction of electrical or telecommunications infrastructure or services, unless under the **Insured Organization's** operational control; or

    2.    fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event;

K.    For, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition (except as provided in Insuring Agreement F.11), false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act, as amended;

L.    For, arising out of or resulting from any actual or alleged false, deceptive or unfair trade practices, or violation of consumer protection laws; however this exclusion does not apply to:

    1.    any **Claim** covered under Insuring Agreements C.1., C.2., C.3. or E. that results from a theft, loss or **Unauthorized Disclosure of Personally Identifiable Non-Public Information** provided that no member of the **Control Group** participated or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure**; or

    2.    any **Claims Expenses** (but the exclusion will apply to **Damages**) resulting from a **Claim**:

        (a)    brought by a customer of, or recipient of services provided by, the **Insured Organization**; or

        (b)    where such allegations are part of and alleged in conjunction with a **Claim** for which this Insurance would respond;

M.    For, in connection with or resulting from a **Claim** brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; provided, this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreement E.;

N.    For, arising out of or resulting from any actual or alleged:

    1.    infringement of patent or patent rights or misuse of patent;

    2.    misappropriation of trade secret arising out of or related to **Technology Products** or any other goods or products;

    3.    under Insuring Agreement C., use or misappropriation of any ideas, trade secrets or **Third Party Corporate Information** (i) by,

or on behalf of, the **Insured Organization**, or (ii) by any other person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**; or

4.    under Insuring Agreement C.2., theft of or **Unauthorized Disclosure** of a **Data Asset**;

O.    For, arising out of or resulting from any of the following:

1.    any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law;

2.    any actual or alleged violation of any securities law, regulation or legislation, including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, the Sarbanes-Oxley Act of 2002, any state or provincial blue sky or securities law, any other federal securities law or legislation, or any other similar law or legislation of any state, province or other jurisdiction, or any amendment to the above laws, or any violation of any order, ruling or regulation issued pursuant to the above laws; or

3.    any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts, including any violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA) or any similar federal law or legislation, or similar law or legislation of any state, province or other jurisdiction, or any amendment to ERISA or any violation of any regulation, ruling or order issued pursuant to ERISA or such similar laws or legislation;

however, this exclusion does not apply to any otherwise covered **Claim** under Insuring Agreements C.1., C.2., or C.3., or to paying **Privacy Notification Costs** under Insuring Agreement D., that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**, provided that no member of the **Control Group** participated or colluded in, or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure**;

P.    For, arising out of or resulting from a **Claim** by or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided, this exclusion shall not apply to:

1. an otherwise covered **Claim** under Insuring Agreements C.1., C.2., or C.3. made by a current or former employee of the **Insured Organization**; or

2. any **Claim** by or on behalf of an **Additional Insured**;

Q. For, arising out of or resulting from any **Claim** made by any business enterprise in which any **Insured** has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of the **Named Insured**; or any **Insured's** activities as a trustee, partner, member, **Manager**, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

R. Arising out of **Professional Services**, **Media Activities** or **Technology Based Services** performed for any entity, or **Technology Products** provided to any entity which is operated, managed or controlled by an **Insured** or in which any **Insured** has an ownership interest in excess of fifteen percent (15%); or in which any **Insured** is an officer or director;

S. For, arising out of or resulting from:

1. any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such **Claim** is brought by an employee, former employee, applicant for employment, or relative or domestic partner of such person; provided, however, that this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreements C.1., C.2. or C.3. by a current or former employee of the **Insured Organization**, or **Privacy Notification Costs** involving current or former employees of the **Insured Organization**;

2. any actual or alleged violation of the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970, any similar law or legislation of any state, province or other jurisdiction, or any amendment to the above law or legislation, or any violation of any order, ruling or regulation issued pursuant to the above laws or legislation;

3. any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy;

T. For, arising out of or resulting from any actual or alleged (a) unlawful distribution of email, direct mail, text messages or facsimiles, (b) unlawful telemarketing, or (c) eavesdropping, wiretapping or audio or video recording, if any of the above is done by or on behalf of the **Insured**

**Organization**; provided this exclusion shall not apply to **Claims Expenses** arising out of or resulting from audio or video recording which are otherwise covered by the Policy, provided, further, that coverage under such exception shall be subject to a $1,000,000 aggregate limit of liability in the for the **Policy Period**, in excess of the **Retention**, and shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** listed in Item 3.A. of the Declarations;

U.   For, arising out of or resulting from any actual or alleged act, error or omission or beach of duty by any director, officer or **Manager** in the discharge of their duty if the **Claim** is brought by the **Named Insured**, a **Subsidiary**, or any principals, directors, officers, **Managers**, stockholders, members or employees of the **Named Insured** or a **Subsidiary** in his or her capacity as such;

V.   Brought by or on behalf of:

  1.   any intellectual property licensing bodies or organizations, including but not limited to, the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers or Broadcast Music, Inc.; or

  2.   under Insuring Agreement F., any independent contractor, then current joint venturer or then current venture partner and arising out of or resulting from disputes over ownership of rights in **Media Material** or services provided by such independent contractor, then current joint venturer or then current venture partner;

W.   For, arising out of or resulting from any of the following: (1) trading losses, trading liabilities or change in value of accounts; any loss, transfer or theft of monies, securities or tangible property of others in the care, custody or control of the **Insured Organization**; (2) the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; or (3) the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

X.   Under Insuring Agreement E., (a) costs to remediate or improve the **Insured Organization's Computer Systems**, (b) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies, (c) audit, assessment, compliance or reporting costs, or (d) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Non-Public Information** from theft, loss or disclosure, even if it is in response to a regulatory proceeding or investigation; or

Y.   Either in whole or in part, directly or indirectly, arising out of or resulting from or in consequence of, or in any way involving:

1. asbestos, or any materials containing asbestos in whatever form or quantity;

2. the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

   The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3. the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4. the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

## VI.   DEFINITIONS

Wherever used in this Policy in bold face type, the following definitions shall apply.

A.   **Additional Insured** means:

1. any natural person or entity that the **Insured Organization** has expressly agreed in writing to add as an **Additional Insured** under this

policy prior to the commission of any act for which such person or entity would be provided coverage for under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**; and

2. any other person or entity added an **Additional Insured** by endorsement to this Policy.

B. **Advertising** means material which promotes the product, service or business of the **Insured Organization** or others.

C. **Application** means all applications, including any attachments thereto, and all other information and materials submitted or specifically referenced by or on behalf of the **Insured** to the Underwriters in connection with the underwriting of this Policy, or prior policies of which this Policy is a renewal thereof.

D. **Assumed Under Contract** means liability assumed by the **Insured Organization** under a written hold harmless or indemnity agreement regarding the content of **Media Material** used in a **Media Communication**, but only as respects acts for which insurance is afforded under Insuring Agreement F.

E. **Bodily Injury** means physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting therefrom.

F. **Breach Notice Law** means any statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or reasonably may have been accessed by an unauthorized person.

G. **Claim** means:

1. a written demand received by any **Insured** for money or services, including the service of a suit or institution of arbitration proceedings;

2. a threat or initiation of a suit seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction).

3. with respect to coverage provided under Insuring Agreement E. only, institution of a **Regulatory Proceeding** against any **Insured**; and

4. a written request or agreement to toll or waive a statute of limitations relating to a potential **Claim** described above.

Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or

omissions, or from multiple **Security Breaches** arising from a failure of **Computer Security**, shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim**. All such **Claims** shall be deemed to have been made at the time of the first such **Claim**.

H.     **Claims Expenses** means:

1.     reasonable and necessary fees charged by an attorney designated pursuant to Clause II., Defense and Settlement of Claims, paragraph A.;

2.     all other legal costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, or circumstance which might lead to a **Claim**, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters; and

3.     the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **Claim** against an **Insured**; provided the Underwriters shall have no obligation to appeal or to obtain bonds.

**Claims Expenses** do not include any salary, overhead or other amounts charged or incurred by the **Insured** in assisting the Underwriters or cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy or costs to comply with any regulatory orders, settlements or judgments.

I.     **Computer Security** means software, computer or network hardware devices, as well as the **Insured Organization's** written information security policies and procedures, the function or purpose of which is to prevent **Unauthorized Access or Use**, a **Denial of Service Attack** against **Computer Systems**, infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**. **Computer Security** includes anti-virus and intrusion detection software, firewalls and electronic systems that provide access control to **Computer Systems** through the use of passwords, biometric or similar identification of authorized users.

J.     **Computer Systems** means computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

1.     operated by and either owned by or leased to the **Insured Organization**; or

2.     systems operated by a third party service provider and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data, pursuant to written contract with the **Insured Organization** for such services.

K.    **Continuity Date** means (i) the date stated in Item 6.B. of the Declarations with respect to the **Named Insured** and any **Subsidiaries** acquired before the date stated in Item 6.B. of the Declarations; or (ii) with respect to any **Subsidiaries** acquired after the date stated in Item 6.B. of the Declarations, the date the **Named Insured** acquired such **Subsidiary**.

L.    **Control Group** means the individuals holding the following positions in the **Insured Organization**: President; members of the Board of Directors; executive officers, including the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer; General Counsel, staff attorneys employed by the **Insured Organization**; Chief Information Officer; Chief Security Officer; Chief Privacy Officer; **Manager**; and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual, and any individual who previously held any of the above referenced positions.

M.    **Damages** means a monetary judgment, award or settlement, provided that the term **Damages** shall not include or mean:

    1.    future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

    2.    return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided;

    3.    costs incurred by the **Insured** to correct, re-perform or complete any **Professional Services, Media Activities** or **Technology Based Services**;

    4.    taxes or loss of tax benefits;

    5.    fines, sanctions, penalties or any damages which are a multiple of compensatory damages;

    6.    punitive or exemplary damages, unless insurable by law in any applicable venue that most favors coverage for such punitive or exemplary damages;

    7.    discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

    8.    liquidated damages to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement; or

    9.    any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

N.    **Data Asset** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back up procedures,

including computer programs, applications, account information, customer information, private or personal information, marketing information, financial information and any other information maintained by the **Insured Organization** in its ordinary course of business.

O.   **Denial of Service Attack** means an attack intended by the perpetrator to overwhelm the capacity of a **Computer System** by sending an excessive volume of electronic data to such **Computer System** in order to prevent authorized access to such **Computer System**.

P.   **Loss** means **Damages**, **Claims Expenses**, **Privacy Notification Costs** and **Penalties**.

Q.   **Malicious Code** means any virus, Trojan horse, worm or any other similar software program, code or script intentionally designed to insert itself into computer memory or onto a computer disk and spread itself from one computer to another.

R.   **Management Control** means:

1.   owning, directly or indirectly, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of an entity's directors (in the case of a corporation), members of the board of managers (in the case of a limited liability company), management committee members (in the case of a joint venture or partnership) or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States; or

2.   having the right, pursuant to a written contract or the bylaws, charter, operating agreement or similar documents of an entity to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture or partnership; the management board of a limited liability company; or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States.

S.   **Manager** means a manager of a limited liability company.

T.   **Media Activities** means **Media Communications** and/or the gathering, collection or recording of **Media Material** for inclusion in any **Media Communication** in the ordinary course of the **Insured Organization's** business.

U.   **Media Communication** means the display, broadcast, dissemination, distribution, release, re-broadcast, re-transmission, electronic display or electronic publication of **Media Material** to the public by the **Insured Organization**.

V.   **Media Material** means words, sounds, numbers, images, or graphics or other information in electronic, print or broadcast form, including **Advertising**, but does not mean computer software or the actual goods,

products or services described, illustrated or displayed in such **Media Material**.

W.      **Named Insured** means the individual, partnership, entity or corporation designated as such in Item 1. of the Declarations.

X.      **Optional Extension Period** means the period of time after the end of the **Policy Period** for reporting **Claims** as provided in Clause X., Optional Extension Period, of this Policy.

Y.      **Penalties** means:

1.      any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by the Federal Trade Commission, Federal Communications Commission, or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

2.      amounts which the Insured is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered by Insuring Agreements C.1., C.2. or C.3.

Z.      **Personally Identifiable Non-Public Information** means:

1.      information concerning the individual that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.      medical or heath care information concerning the individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act;

3.      information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for **Claims** subject to the law of such jurisdiction;

4.      information concerning the individual that is defined as private personal information under a **Breach Notice Law**; or

5.      the individual's drivers license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or PINs;

if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information but does not include publicly available information that is lawfully made available to the general public from government records.

AA.     **Policy Aggregate Limit of Liability** means the aggregate Limit of Liability set forth in Item 3.A. of the Declarations.

BB.     **Policy Period** means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any **Optional Extension Period** or any prior policy period or renewal period.

CC.     **Privacy Law** means a federal, state or foreign statute or regulation requiring the **Insured Organization** to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information**.

DD.     **Privacy Policy** means the **Insured Organization's** publicly available written statement of its policy for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to **Personally Identifiable Non-Public Information**.

EE.     **Professional Services** means only the following services performed for others by or on behalf of the **Insured Organization**:

Product sale and fulfillment services, teleservices including the operation of customer services and telephone call centers and customer relationship management activities, online/offline matchmaking, dating and personal services and local information services, and distribution of third party programming.

FF.     **Property Damage** means physical injury to or destruction of any tangible property, including the loss of use thereof.  For the purpose of this definition, tangible property shall not include electronic data.

GG.     **Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of the Federal Trade Commission, Federal Communications Commission, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

HH.     **Retention** means the applicable retention for each Insuring Agreement as specified in Item 4. of the Declarations.

II.      **Retroactive Date** means the date specified in Item 6.A. of the Declarations.

JJ.      **Security Breach** means:

1. **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

2. a **Denial of Service Attack** against **Computer Systems** or **Third Party Computer Systems**; or

3. infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**,

regardless of whether any of the foregoing is a specifically targeted or generally distributed attack.

A series of continuing **Security Breaches**, related or repeated **Security Breaches**, or multiple **Security Breaches** resulting from a continuing failure of **Computer Security** shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**.

KK.  **Subsidiary** means any corporation, limited liability company, joint venture or partnership while the **Named Insured** has **Management Control** over such entity, if the **Named Insured**:

1. had **Management Control** over such entity on the inception date of this Policy or such entity was an insured under a policy issued by the Underwriters of which this Policy is a renewal;

2. acquires **Management Control** after the inception date of this Policy, provided the revenues of the entity do not exceed fifteen percent (15%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**; or

3. acquires **Management Control** after the inception date of this Policy, provided that if the revenues of the entity exceed fifteen percent (15%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, the provisions of Clause XVI., Mergers and Acquisitions, must be fulfilled;

provided, that this Policy only provides coverage for acts, errors, omissions, incidents or events that take place while the **Named Insured** has **Management Control** over such entity.

LL.  **Technology Based Services** means computer and electronic technology services, including data processing, Internet services, data and application hosting, computer systems analysis, technology consulting and training, custom software programming for a specific client of the **Insured Organization**, computer and software systems installation and integration, computer and software support, and network management services performed by the **Insured**, or by others acting under the **Insured Organization's** trade name, for others for a fee (or for free if provided (i) to potential or existing customers as an encouragement to purchase such

products or services, or (ii) in conjunction with other fee based services or products provided for compensation), but shall not mean **Technology Products**.

MM. **Technology Products** means a computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others, for compensation, including software updates, service packs and other maintenance releases provided for such products.

NN. **Third Party Computer Systems** means any computer systems that: (1) are not owned, operated or controlled by an Insured; and (2) does not include computer systems of a third party on which an **Insured** performs services. Computer systems include associated input and output devices, data storage devices, networking equipment, and back up facilities.

OO. **Third Party Corporate Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public and is provided to the **Insured** subject to a fully executed written confidentiality agreement or which the **Insured Organization** is legally required to maintain in confidence; however, **Third Party Corporate Information** shall not include **Personally Identifiable Non-Public Information**.

PP. **Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person or persons or the use of **Computer Systems** in an unauthorized manner.

QQ. **Unauthorized Disclosure** means the disclosure (including disclosure resulting from phishing) of or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent, or acquiescence of any member of the **Control Group**.

## VII. LIMIT OF LIABILITY

A. The **Policy Aggregate Limit of Liability** stated in Item 3.A.of the Declarations is the Underwriters' combined total limit of liability for all **Loss** payable under this Policy.

The sublimit of liability stated in Item 3.B. of the Declarations is the aggregate limit of liability payable under this Policy for all **Privacy Notification Costs** covered under Insuring Agreement D.

The sublimit of liability stated in Item 3.C. of the Declarations is the aggregate limit of liability under this Policy for all **Claims Expenses** and **Penalties** covered under Insuring Agreement E.

The above sublimits of liability are part of, and not in addition to, the **Policy Aggregate Limit of Liability** listed in Item 3.A. of the Declarations.

Neither the inclusion of more than one Insured under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

B.    The Limit of Liability for the **Optional Extension Period** shall be part of and not in addition to the **Policy Aggregate Limit of Liability**.

C.    The Underwriters shall not be obligated to pay any **Loss**, or to undertake or continue defense of any suit or proceeding, after the **Policy Aggregate Limit of Liability** or any other applicable limit of liability set forth in the Declarations has been exhausted by payment of **Loss**, or after deposit of the **Policy Aggregate Limit of Liability** or any other applicable limit of liability in a court of competent jurisdiction. Upon such payment, the Underwriters shall have the right to withdraw from the further defense of any **Claim** under this Policy by tendering control of said defense to the **Insured**.

## VIII.    RETENTION

A.    The **Retention** amount set forth in Item 4.A. of the Declarations applies separately to each incident, event, or related incidents or events, giving rise to a **Claim**. The **Retention** shall be satisfied by monetary payments by the **Named Insured** of **Damages**, **Claims Expenses or Penalties.**

B.    The **Retention** amount set forth in Item 4.B. of the Declarations applies separately to each incident, event or related incidents or events, giving rise to an obligation to pay **Privacy Notification Costs**. The **Retention** shall be satisfied by monetary payments by the **Named Insured** of **Privacy Notification Costs**.

C.    Satisfaction of the applicable **Retention** is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such **Retention** subject to the Underwriters' total liability not exceeding the **Policy Aggregate Limit of Liability** or any applicable Limit of Liability. The **Named Insured** shall make direct payments within the **Retention** to appropriate other parties designated by the Underwriters.

## IX.    NOTICE OF CLAIM, LOSS OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A.    If any **Claim** is made against the **Insured**, the **Insured**, upon knowledge of the Office of the Risk Manager or the Office of the General Counsel of the Named Insured (the "**Claims Control Group**"), shall forward as soon as practicable to the Underwriters through persons named in Item 8.(a) of the Declarations written notice of such **Claim** in the form of a telecopy, email, or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's**

representative. Notwithstanding the foregoing, all **Claims** made against any **Insured** must be reported no later than (i) the end of the **Policy Period**, (ii) sixty (60) days after the expiration date of the **Policy Period** in the case of **Claims** first made against the **Insured** during the last sixty (60) days of the **Policy Period**, (iii) the end of the **Optional Extension Period** (if applicable), or (iv) one year after the expiration date of the **Policy Period** for **Claims** not known to the **Claims Control Group** at the end of the **Policy Period**.

In the event of any cancellation or nonrenewal of this Policy, all **Claims** made against any **Insured** must be reported no later than sixty (60) days after the expiration date of the **Policy Period**.

B.   With respect to Insuring Agreement D. for a legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement C.1., C.2. or C.3., such incident or reasonably suspected incident must be reported in writing to the Underwriters through the persons named in Item 8.(a) of the Declarations in the form of a telecopy, email or express or certified mail, including specific details of the incident, as soon as practicable during the **Policy Period** after discovery by the **Insured**; provided, however, that unless the **Insured** cancels the Policy, or the Underwriters cancel for non-payment of premium, incidents discovered by the **Insured** within sixty (60) days prior to expiration of the Policy shall be reported as soon as practicable, but in no event later than sixty (60) days after the end the **Policy Period**; provided further, that if this Policy is renewed by the Underwriters and covered **Privacy Notification Costs** are incurred because of such incident or suspected incident that was discovered by the **Insured** within sixty (60) days prior to the expiration of the Policy, and first reported during the sixty (60) day post **Policy Period** reporting period, then any subsequent **Claim** arising out of such incident or suspected incident is deemed to have been made during the **Policy Period**.

C.   If during the **Policy Period** the **Claims Control Group** first becomes aware of any circumstance that could reasonably be the basis for a **Claim**, the **Insured** may give written notice to the Underwriters of such circumstance in the form of a telecopy, email or express or certified mail through persons named in Item 8.(a) of the Declarations as soon as practicable during the **Policy Period**. Such notice must include:

1.   the specific details of the act, error or omission in the provision of **Professional Services**, **Media Activities** or **Technology Based Services** or relating to **Technology Products** or a **Security Breach** that could reasonably be the basis for a **Claim**;

2.   the injury or damage which may result or has resulted from the circumstance; and

3.   the facts by which the **Insured** first became aware of the act, error, or omission or **Security Breach**.

Any subsequent **Claim** made against the **Insured** arising out of such circumstance which is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to the Underwriters.

D.      A **Claim** or legal obligation under paragraph A. or B. above shall be considered to be reported to the Underwriters when written notice is first received by the Underwriters in the form of a telecopy, email or express or certified mail or email through persons named in Item 8.(a) of the Declarations of the **Claim** or legal obligation, or of an act, error, or omission, which could reasonably be expected to give rise to a **Claim** if provided in compliance with paragraph C. above.

## X.      OPTIONAL EXTENSION PERIOD

A.      In the event of the termination of this Insurance for any reason except the non-payment of premium, the **Named Insured** designated in Item 1. of the Declarations shall have the right, upon payment in full and not proportionally or otherwise in part of the percentage shown in Item 7.A. of the Declarations of the full Premium set forth below,  to have issued an endorsement providing an **Optional Extension Period** for the period of time set forth in Item 7.B. of the Declarations for **Claims** first made against any **Insured** and reported to the Underwriters during the **Optional Extension Period**, and arising out of any act, error or omission committed on or after the **Retroactive Date** and before the end of the **Policy Period**, subject to the conditions set forth herein.  In order for the **Named Insured** to invoke the **Optional Extension Period** option, the payment of the additional premium for the **Optional Extension Period** must be paid to the Underwriters within thirty (30) days of the termination of this Insurance. If notice of election of the **Optional Extension Period** and full premium payment is not given to the Underwriters within such thirty (30) day period, there shall be no right to purchase the **Optional Extension Period**.

B.      The Limit of Liability for the **Optional Extension Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** and the exercise of the **Optional Extension Period** shall not in any way increase the **Policy Aggregate Limit of Liability** or any sublimit of liability.  The **Optional Extension Period** does not apply to Insuring Agreement D.

C.      The right to the **Optional Extension Period** shall not be available to the **Named Insured** where the Policy premium has not been paid in full, or where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable limit of liability or within the amount of the applicable **Retention**.

D.      All notices and premium payments with respect to the **Optional Extension Period** option shall be directed to the Underwriters through the entity named in Item 8.(b) of the Declarations.

E.      At the commencement of the **Optional Extension Period** the entire premium shall be deemed earned, and in the event the **Named Insured**

terminates the **Optional Extension Period** for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the **Optional Extension Period**.

## XI. WARRANTY

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations, that they shall be deemed material to the risk assumed by Underwriters, and that this Policy is issued in reliance upon the truth thereof.

## XII. OTHER INSURANCE

The insurance under this Policy shall apply in excess of any other valid and collectible insurance available to any **Insured**, including any self insured retention or deductible portion thereof, unless such other insurance is written only as specific excess insurance over the **Policy Aggregate Limit of Liability** or any other applicable Limit of Liability of this Policy.

## XIII. ASSIGNMENT

The interest hereunder of any **Insured** is not assignable. If the **Insured** shall die or be adjudged incompetent, such insurance shall cover the **Insured's** legal representative as the **Insured** as would be permitted by this Policy.

## XIV. CANCELLATION

This Policy may not be cancelled by any **Insured** or the Underwriters, except for non-payment of premium. If the Underwriters cancel this Policy because the **Insured** has failed to pay a premium when due, this Policy may be canceled by mailing or delivering a written notice of cancellation to the **Named Insured** stating when not less than ten (10) days thereafter such cancellation shall be effective. The notice of cancellation shall state the reason for cancellation. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery (where permitted by law) of such written notice either by the **Named Insured** or by the Underwriters shall be equivalent of mailing.

## XV. MERGERS AND ACQUISITIONS

### A. Newly Acquired Subsidiaries

If during the **Policy Period** the **Named Insured** or any **Subsidiary** acquires any entity whose annual revenues are more than fifteen percent (15%) of the **Named Insured's** total annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, then, subject to the **Policy Period** and all other terms and conditions of this Policy, coverage under this Policy shall be afforded for a period of sixty (60) days, but only for any **Claim** that arises out of any act, error or omission first committed or incident or event first occurring after the entity becomes so owned. Coverage beyond such sixty (60) day period shall only be available if the **Named Insured** gives the Underwriters written

notice of the acquisition, obtains the written consent of the Underwriters to extend coverage beyond such sixty (60) day period to the entity and agrees to pay any additional premium required by the Underwriters.

B. **Mergers or Consolidations**

If during the **Policy Period** the **Named Insured** consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then this Policy shall remain in full force and effect, but only with respect to a **Security Breach**, or other acts or incidents that occur prior to the date of the consolidation, merger or acquisition. No coverage shall be provided by this Policy for any other **Claim** or **Loss** unless the **Named Insured** provides written notice to the Underwriters prior to such consolidation, merger or acquisition, the Named Insured has agreed to any additional premium and terms of coverage required by the Underwriters and the Underwriters have issued an endorsement extending coverage under this Policy.

C. All notices and premium payments made under this Clause XV. shall be directed to the Underwriters through the entity named in Item 8.(b) of the Declarations.

## XVI. ASSISTANCE AND COOPERATION

A. The Underwriters shall have the right to make any investigation they deem necessary, and the **Insured** shall cooperate with the Underwriters in all investigations, including investigations regarding the **Application** for and coverage under this Policy. The **Insured** shall execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy.

However, notwithstanding the above, the **Insured's** rights under this Policy shall not be prejudiced by any refusal to disclose the identity of any confidential source of information, or to produce any documentation or information obtained in the course of **Media Activities** in respect of which the **Insured** has asserted a claim of reporter's privilege or any other privilege regarding the protection of news-gathering activities.

B. Upon the Underwriters' request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of acts, errors or omissions, incidents or events with respect to which insurance is afforded under this Policy; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

C. The **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without the written consent of

the Underwriters, except as specifically provided in Clause II., Defense and Settlement of Claims, paragraph D.

Compliance with a **Breach Notice Law** will not be considered as an admission of liability for purposes of this Clause XVI.C.

D.     Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters do not constitute **Claims Expenses** under the Policy.

## XVII.    ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters or the Underwriters' representatives unless and until, as a condition precedent thereto, the **Insured** shall have fully complied with all provisions, terms and conditions of this Insurance, and the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant and the Underwriters.  No person or organization shall have the right under this Policy to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor shall the Underwriters be impleaded by the **Insured** or the **Insured's** legal representatives.  The **Insured's** bankruptcy or insolvency or of the **Insured's** estate shall not relieve the Underwriters of their obligations hereunder.

## XVIII.    SUBROGATION

If any payment is made under this Policy and there is available to the Underwriters any of the **Insured's** rights of recovery against any other party, then the Underwriters shall maintain all such rights of recovery.  The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing to prejudice such rights without the Underwriters' prior written approval.  Any recoveries shall be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to the **Retention**.  Any additional amounts recovered shall be paid to the **Named Insured**.

## XIX.    ENTIRE AGREEMENT

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between the Underwriters and the **Insured** relating to this Policy. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Insurance; nor shall the terms of this Insurance be waived or changed, except by endorsement issued to form a part of this Policy signed by the Underwriters.

## XX.    VALUATION AND CURRENCY

All premiums, limits, deductibles, **Damages** and other amounts under this Policy are expressed and payable in the currency of the United States.  If judgment is rendered, settlement is denominated or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if **Claims**

**Expenses** are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Damages** is due or the date such **Claims Expenses** are paid.

## XXI. AUTHORIZATION

By acceptance of this Policy and the coverage provided hereunder, the **Insureds** agree and acknowledge that (a) the **Named Insured** will act on their behalf with respect to the giving and receiving of any notice pertaining to this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements; and (b) the Underwriters shall not bear any liability in connection with the same.

## XXII. HEADINGS

The titles of paragraphs, sections, provisions or endorsements of or to this Policy are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Policy.

## XXIII. SERVICE OF SUIT CLAUSE (U.S.A.)

A.  It is agreed that in the event of the failure of the Underwriters to pay any amount claimed to be due under this Insurance, the Underwriters herein, at the **Insured's** request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of process in such suit may be made upon the Underwriters' representative designated in Item 10. of the Declarations, and that in any suit instituted against any one of the Underwriters upon this Policy, the Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

B.  The Underwriters' representative designated in Item 10. of the Declarations is authorized and directed to accept service of process on the Underwriters' behalf in any such suit and/or upon the Insured's request to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

C.  Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any

lawful process in any action, suit or proceeding instituted by or on the **Insured's** behalf or any beneficiary hereunder arising out of this Policy, and hereby designate the Underwriters' representative designated in Item 10. of the Declarations as the person to whom said officer is authorized to mail such process or a true copy thereof.

## XXIV. SINGULAR FORM OF A WORD

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

## XXV. CHOICE OF LAW

Unless otherwise set forth in Item 11. of the Declarations, this Policy shall be interpreted in accordance with New York state law, without giving effect to conflicts of laws principles, other than such principles directing application of New York law.



**RENEWAL APPLICATION**

**AFB MEDIA TECH®  PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, COMPUTER NETWORK SECURITY, AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**

**MISCELLANEOUS PROFESSIONAL LIABILITY INSURANCE POLICY**

NOTICE:  THE POLICY FOR WHICH THIS APPLICATION IS MADE IS A CLAIMS MADE AND REPORTED POLICY SUBJECT TO ITS TERMS.  THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS AND REPORTED IN WRITING TO THE INSURER DURING THE POLICY PERIOD OR OPTIONAL EXTENSION PERIOD, IF APPLICABLE. AMOUNTS INCURRED AS CLAIMS EXPENSES SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE DEDUCTIBLE. PLEASE READ THIS POLICY CAREFULLY.

NOTICE TO NEW YORK APPLICANTS:  THE POLICY FOR WHICH THIS APPLICATION IS MADE, IS A CLAIMS MADE POLICY. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENSION PERIOD WILL APPLY.  FOR AN ADDITIONAL PREMIUM, AN OPTIONAL EXTENSION PERIOD CAN BE PURCHASED AS INDICATED IN ITEM 7. OF THE DECLARATIONS. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD, THE AUTOMATIC EXTENSION PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD.  NO COVERAGE EXISTS FOR CLAIMS MADE AFTER THE END OF THE POLICY PERIOD AND THE AUTOMATIC EXTENSION PERIOD UNLESS, AND TO THE EXTENT, THE OPTIONAL EXTENSION PERIOD APPLIES.  NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC EXTENSION PERIOD OR, IF PURCHASED, THE OPTIONAL EXTENSION PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER INSURER.   THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES SHALL BE APPLIED TO THE DEDUCTIBLE.   DURING THE FIRST SEVERAL YEARS OF A CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY. THE INSURER IS NOT OBLIGATED TO PAY ANY DAMAGES AND/OR CLAIMS EXPENSES AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED BY PAYMENT OF DAMAGES AND/OR CLAIMS EXPENSES. PLEASE READ THIS POLICY CAREFULLY.

NOTICE TO MINNESOTA APPLICANTS: THE POLICY FOR WHICH THIS APPLICATION IS MADE IS A CLAIMS MADE AND REPORTED POLICY SUBJECT TO ITS TERMS. THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER OR THE INSURER'S AGENT OR BROKER DURING THE POLICY PERIOD OR OPTIONAL EXTENSION PERIOD, IF APPLICABLE.  THIS MEANS THAT ONLY CLAIMS ACTUALLY MADE DURING THE POLICY PERIOD ARE COVERED UNLESS COVERAGE FOR AN OPTIONAL EXTENSION PERIOD IS PURCHASED.  IF AN OPTIONAL EXTENSION PERIOD IS NOT MADE AVAILABLE TO YOU, YOU RISK HAVING GAPS IN COVERAGE WHEN SWITCHING FROM ONE COMPANY TO ANOTHER. MOREOVER, EVEN IF SUCH A REPORTING PERIOD IS MADE AVAILABLE TO YOU, YOU MAY

**STILL BE PERSONALLY LIABLE FOR CLAIMS REPORTED AFTER THE PERIOD EXPIRES. CLAIMS MADE POLICIES MAY NOT PROVIDE COVERAGE FOR ANY ACTS, ERRORS OR OMISSIONS COMMITTED BEFORE A FIXED RETROACTIVE DATE. RATES FOR CLAIMS MADE POLICIES ARE DISCOUNTED IN THE EARLY YEARS OF A POLICY, BUT INCREASE STEADILY OVER TIME. AMOUNTS INCURRED AS CLAIMS EXPENSES SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE DEDUCTIBLE. PLEASE READ THIS POLICY CAREFULLY.**

Please fully answer all questions and submit all requested information and supplemental forms. Terms appearing in bold face in this **Application** are defined in the Policy and have the same meaning in this **Application** as in the Policy. If you do not have a copy of the Policy, please request it from your agent or broker. This **Application**, including all materials submitted herewith, shall be held in confidence.

Please fully answer all questions and submit all requested information. Terms appearing in bold face in this **Application** are defined in the Policy and have the same meaning in this **Application** as in the Policy. If you do not have a copy of the Policy, please request it from your agent or broker. This **Application**, including all materials submitted herewith, shall be held in confidence.

## ORGANIZATIONAL INFORMATION:

**Insured** Name   **IAC/InterActiveCorp**
If any of the following information has changed since the inception of your current policy, please check here ☐.
If checked please furnish the new information below:
Principal Address **555 West 18th Street**
City, State, Zip **New York, NY  10011**        Web Address **http://www.iac.com**

Primary Business Activity/NAICS Code (SIC Code if NAICS is unavailable) **519130**

Nature of Operations
IAC is a leading media and Internet company focused on the areas of search, applications, online dating, media and eCommerce. Ranked by Fortune magazine's annual standing of the world's most admired companies in the Internet Services & Retailing sector for many years, IAC's family of websites is one of the largest in the world, with over two billion monthly visits reaching users in more than 200 countries. The company is headquartered in the Chelsea neighborhood of New York City and has business operations and satellite offices around the world.

If **Insured** is a subsidiary of another company (ies), please provide the name of the parent company (ies):

Business Organization:    Corporation ☒ Partnership ☐ Limited Liability Corporation ☐

## COVERAGE REQUESTED:

If you are requesting a different limit or retention from your expiring policy please check here ☐.
If checked, please indicate requested changes below:

1.    Different Limit Requested       $        (Defense is included in the Limit)

2.    Different Retention Requested  $

If you are requesting coverage in addition to your expiring policy, please check here ☐.
If checked, please indicate additional coverages for which you are requesting coverage:

☐ Directors & Officers Liability ☐ Employment Practices Liability ☐ Fiduciary Liability ☐ Crime ☐ Errors and Omissions ☐ Technology Errors and Omissions ☐ Architects and Engineers Errors and Omissions

## UNDERWRITING INFORMATION:

### A.  Gross Revenue/Changes to Business:

Projected for the next 12 months:  $3,400,000,000  FY 15
Actual for the last 12 months:  $3,109,500,000  FY 14

1.  Are significant changes in the nature or size of the **Insured's** business anticipated over the next twelve (12) months?  Or have there been any such changes in the past twelve (12) months?
   ☐ Yes ☒ No

2.  Has the **Insured** in the past twelve (12) months completed or agreed to, or does it contemplate within the next twelve (12) months, a merger, acquisition, consolidation, whether or not such transactions were or will be completed?
   ☒ Yes ☐ No

*If yes was answered for any question above, please provide details on a separate sheet.*

### B.  Technology Errors and Omissions Coverage:

1.  Has there been a material change in 1) the nature and types of professional and/or technology services the **Insured** is engaged in; 2) the types of Technology Products developed, manufactured, licensed or sold by the **Insured**; or 3) the **Insured's** URL address or content?
   ☐ Yes ☒ No

2.  Has there been any material change to the **Insured's** operational controls, management of content and privacy exposures, computer system access protection, data back-up procedures, or data encryption procedures?
   ☐ Yes ☒ No

*If yes was answered for any question above, please provide details on a separate sheet.*

### C.    Miscellaneous Errors and Omissions Coverage:

1.  Has there been any material change in the nature or type of professional services the **Insured** is engaged in?
   ☐ Yes ☒ No

2.  Does the **Insured** wish to have additional services covered by this professional liability insurance?
   ☐ Yes ☒ No

3.  Has there been any material change to the contract used by the **Insured**?
   ☐ Yes ☒ No

4.  Total current employees:  8612 (including full time and part time)

*If yes was answered for any question above, please provide details on a separate sheet.*

THE UNDERSIGNED IS AUTHORIZED BY THE INSURED AND DECLARES THAT THE STATEMENTS SET FORTH HEREIN AND ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE TRUE. SIGNING OF THIS APPLICATION DOES NOT BIND THE INSURED OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS

AGREED THAT THE STATEMENTS CONTAINED IN THIS APPLICATION, ANY SUPPLEMENTAL APPLICATIONS, AND THE MATERIALS SUBMITTED HEREWITH ARE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED AND HAVE BEEN RELIED UPON BY THE INSURER IN ISSUING ANY POLICY.

THIS APPLICATION AND MATERIALS SUBMITTED WITH IT SHALL BE RETAINED ON FILE WITH THE INSURER AND SHALL BE DEEMED ATTACHED TO AND BECOME PART OF THE POLICY IF ISSUED. THE INSURER IS AUTHORIZED TO MAKE ANY INVESTIGATION AND INQUIRY IN CONNECTION WITH THIS APPLICATION AS IT DEEMS NECESSARY. PROVIDED, HOWEVER, THIS PARAGRAPH DOES NOT APPLY IN THE STATES OF UTAH AND WISCONSIN.

NOTE TO UTAH AND WISCONSIN RESIDENTS: ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE MADE A PART HEREOF PROVIDED THIS APPLICATION AND SUCH MATERIALS ARE ATTACHED TO THE POLICY AT THE TIME OF ITS DELIVERY.

THE INSURED AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, THE INSURED WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE.

### WARNING

**ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT (S)HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT MAY BE GUILTY OF INSURANCE FRAUD.**

**NOTICE TO ARKANSAS APPLICANTS**: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO COLORADO APPLICANTS**: "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:** "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN

ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**NOTICE TO FLORIDA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

**NOTICE TO KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

**NOTICE TO LOUISIANA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINMENT IN PRISON."

**NOTICE TO MAINE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO NEW JERSEY APPLICANTS**:  "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO NEW MEXICO APPLICANTS**: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

THE INSURER SHALL NOT OFFER AN **OPTIONAL EXTENSION PERIOD** FOR THIS POLICY IN NEW MEXICO.

**NOTICE TO OHIO APPLICANTS**: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**NOTICE TO OKLAHOMA APPLICANTS:** "ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY."

**NOTICE TO OREGON APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO MAY BE GUILTY OF INSURANCE FRAUD WHICH MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES, INCLUDING BUT NOT LIMITED TO FINES, DENIAL OF INSURANCE BENEFITS, CIVIL DAMAGES, CRIMINAL PROSECUTION AND CONFINEMENT IN STATE PRISONS."

**NOTICE TO PENNSYLVANIA APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO TENNESSEE, VIRGINIA AND WASHINGTON APPLICANTS**: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**NOTICE TO NEW YORK APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIMS CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

Signed: _____

Nick Stoumpas, SVP, Treasurer

_____
Must be signed by corporate officer with authority to sign on Insured's behalf

Date: _____14_____    _____August_____    _____2015_____
               Day                    Month                    Year

If this **Application** is completed in Florida, please provide the Insurance Agent's name and license number as designated. If this **Application** is completed in Iowa, please provide the Insurance Agent's name only.

_____                    _____
Name of Insurance Agent                          License Identification No.

_____
Authorized Representative

*If this **Application** is completed in Wisconsin, please note the following:*

- *As a condition precedent to the right to purchase the **Optional Extension Period**, the total premium for this Policy must have been paid. The right to purchase the **Optional Extension Period** shall terminate unless written notice together with full payment of the premium for the **Optional Extension Period** is given to the Insurer within thirty (30) days after the effective date of cancellation or nonrenewal. If such notice and premium payment is not so given to the Insurer, there shall be no right to purchase the **Optional Extension Period**.*

- *In the event of the purchase of the **Optional Extension Period**, the entire premium for the **Optional Extension Period** shall be deemed earned at its commencement.*

- *If this Policy is cancelled by the Named Insured, the Insurer shall retain the customary short rate portion of the premium hereon. If this Policy is cancelled by the Insurer, the Insurer shall retain the pro rata portion of the premium hereon. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation.*