# Exhibit 1

# SHANNON A. LANG, PLLC
440 Louisiana Street • Suite 900 • Houston, Texas 77002
832.479.9400 tel. • 832.479.9421 fax
shannon@shannonlanglaw.com

February 16, 2016

**SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 &**
**CALIFORNIA EVIDENCE CODE SECTION 1152**

**BY CERTIFIED FIRST CLASS MAIL**
Joey Levin, CEO
IAC/INTERACTIVE CORP.
555 West 18th Street
New York, New York  10011

Gregg J. Winiarski
Executive Vice President & General Counsel
IAC/INTERACTIVE CORP.
555 West 18th Street
New York, New York  10011

Greg Blatt
Chairman & CEO
MATCH GROUP, INC.
555 West 18th Street
New York, New York  10011

Sean Rad, CEO
TINDER, INC.
8899 Beverly Boulevard
Los Angeles, California  90048

  Re: John Mellesmoen/"Super Like"

Gentlemen,

  My co-counsel, Mitch Mosvick, and I represent John Mellesmoen and Innovate CoLab LLC in connection with potential legal claims by Mr. Mellesmoen and his company against Tinder, Inc.  Please direct future communications regarding this matter to us.

  We write to apprise you of claims Mr. Mellesmoen has against Tinder stemming from an in-person pitch meeting he had with Sean Rad, then-CEO of Tinder, in January 2014.  As detailed more fully below, in express reliance on Mr. Rad's promise of compensation, Mr. Mellesmoen presented Mr. Rad with product and marketing ideas—in particular the game-changing "Super Like" concept—that were subsequently implemented by Tinder to great fanfare on the eve of Match Group's $400,000,000 IPO.  Mr. Mellesmoen's subsequent attempts to

ADMITTED IN CALIFORNIA, TEXAS, AND THE DISTRICT OF COLUMBIA

February 16, 2016
Page 2

engage Mr. Rad concerning Tinder's use of his idea have been met with outright hostility and a blanket refusal by Mr. Rad to respond to Mr. Mellesmoen's request for a conversation.

We understand that Mr. Rad's rebuffing of our client is consistent with his history of unscrupulous business practices, well-documented in his many interviews with the media in recent years. Nevertheless, it is our hope that after considering the facts here and Mr. Rad's direct promises to our client, reasonable minds may prevail and it is in that spirit that we offer this opportunity for the company to reach an amicable—and confidential—resolution of this dispute without the need for litigation.

## I.    Factual Background

### A.    Mr. Mellesmoen's Pitch to Tinder

Mr. Mellesmoen is a highly-regarded, award-winning product development consultant and innovation specialist.  He works with many successful businesses and entrepreneurs across multiple industries to expand and improve their products and service offerings.  As a direct result of Mr. Mellesmoen's novel concepts and ability to implement his ideas, his clients consistently achieve expanded market penetration, higher sales, new revenue streams, and increased profits. Mr. Mellesmoen has a special interest and expertise in Internet services and online/mobile applications and has been recognized for his start-up ideas in the technology and social media spaces.

On January 22, 2014, Mr. Mellesmoen and Mr. Rad met at a mall in Los Angeles for what was initially planned to be a 10-minute pitch meeting, set up by a mutual business acquaintance.  At the outset of the meeting, Mr. Mellesmoen stated his expectation that use of his idea would be compensated via a percentage of revenue generated as a result.  Mr. Rad, as Tinder CEO, unequivocally assured Mr. Mellesmoen that he would operate in "good faith" and would absolutely "reward" Mr. Mellesmoen should the company utilize any ideas that Mr. Mellesmoen presented during the meeting.

In reliance on Mr. Rad's promise, which Mr. Rad repeated multiple times, Mr. Mellesmoen presented his idea.  Mr. Mellesmoen explained that based on his research, a key feature of Tinder also created a frustration:  A user can be "left-swiped" by another user mistakenly or in haste and may never have another opportunity to connect with that desirable user.  In order to avoid a missed connection, Mr. Mellesmoen suggested that Tinder offer a new feature whereby one user can express a heightened interest in another to encourage that other user to give the potential match more consideration.  Mr. Mellesmoen suggested that this new feature, which he proposed calling "Really Like," would lead to more matches and a deeper connection between matches.

Mr. Rad noted in response that the company had been considering a tiered "badge," "gift," or "blurb" feature that users could purchase to promote their profile to the top of another

February 16, 2016
Page 3

user's feed. However, he acknowledged that the company was struggling with conceptualizing this idea, especially as it seemed invasive and complicated, which was inconsistent with Tinder's simple user interface. By contrast, Mr. Mellesmoen's idea would blend seamlessly with the clean and modern interface of the app. Mr. Rad stated directly that he had not thought of Mr. Mellesmoen's approach and was very intrigued by it. Indeed, the anticipated 10-minute meeting lasted approximately 45 minutes, as Mr. Mellesmoen detailed the unique aspects of his idea, both conceptually and in practice, and responded to questions from Mr. Rad about whether the idea was consistent with and would enhance the Tinder user experience.

In particular, Mr. Rad was concerned that users might feel a heightened sense of rejection if they were left-swiped by a user they "really liked." Mr. Mellesmoen suggested that that concern was overstated and outweighed by the value to a user in learning that s/he was "really liked" or "super liked" by another. By being singled out, the "super liked" user would be more likely to have a meaningful interaction with the potential suitor and the suitor would have some reassurance that a user he was particularly interested in had given his profile due consideration. To that end, Mr. Mellesmoen insisted that the more "passive" ideas Mr. Rad indicated were under discussion at the company would not propel the company forward. Instead, Mr. Mellesmoen thought it would be important for users to know they had been "really liked" or "super liked" to enhance the quality of subsequent interactions, either through a notification associated with the targeted user's profile and/or by a push notification.

Mr. Mellesmoen challenged Mr. Rad's presumption that women would not use the feature because they are not "aggressors." Instead, Mr. Mellesmoen explained that the feature provided male _and_ female users an enhanced user experience, enabling women, in particular, to filter out the heavy-right-swiping men believed to frequent the app and allow them to pursue the more limited population of desirable male users.

Mr. Mellesmoen also explained his thoughts on monetizing the idea. Mr. Mellesmoen opposed an idea Mr. Rad claimed was under consideration by the company whereby users could send to others virtual "gifts" of varying cost as an expression of their level of interest. He also questioned Mr. Rad's suggestion of "dynamic pricing," which would increase the cost to use a "super like" on more popular users. Instead, in line with the simplicity of the app, Mr. Mellesmoen suggested the use of pre-purchased credits, liking them to "drinks" purchased at a bar as a means to meet women. Mr. Mellesmoen noted that the commitment of a package would encourage users to return to the app, and suggested that a limit on the number of "really likes" or "super likes" that could be used in a given time period would encourage thoughtful and careful use more likely to result in a match.

Throughout their conversation, Mr. Rad commented frequently on the novelty of Mr. Mellesmoen's approach, noting that Mr. Mellesmoen had a unique view of the "psychology" of Tinder users that Mr. Rad had not previously considered, and stating how helpful Mr. Mellesmoen's approach was to product development. Mr. Rad stated that while the company had been considering a feature whereby users could pay to get their profile to the top of another

February 16, 2016
Page 4

user's queue—an idea that did not appear to be well-developed or even particularly conceptualized—he had not considered the feature Mr. Mellesmoen presented or the user motivations that would render the feature successful. Mr. Rad stated emphatically to Mr. Mellesmoen: "I like this." He gave Mr. Mellesmoen his "word" that he would reach out to Mr. Mellesmoen if and when the company started pursuing the feature, though noting that it was unlikely to be "anytime soon."

### B. Tinder Launches "Super Like"

Contrary to Mr. Rad's promises, approximately a year and a half later, and without ever reaching back out to Mr. Mellesmoen, much less discussing with Mr. Mellesmoen the promised compensation, Tinder launched "Super Like." After years of little to no change in the Tinder user experience, Super Like was touted as the "biggest shift yet" for the company. The Super Like roll-out was part of a dramatic pre-IPO build-up for the company, garnering widespread media attention and rapidly increasing revenue for a company that had struggled to monetize its lauded user base.

In implementing the feature, Tinder adopted the naming convention suggested by Mr. Mellesmoen—choosing "like" over Tinder's proprietary "swipe" nomenclature. It also incorporated Super Like into the clean and simple Tinder interface as Mr. Mellesmoen suggested, rejecting as "too obtrusive" the "blurb" feature Mr. Rad had mentioned, and Mr. Mellesmoen questioned, during Mr. Mellesmoen's pitch meeting.

In promoting the feature, Tinder utilized key concepts presented by Mr. Mellesmoen, including, notably, the value of the feature to female users. Despite Mr. Rad's certainty that the feature would not appeal to women when Mr. Mellesmoen initially presented the idea, Tinder launched Super Like with a mock trailer featuring a woman using Super Like to wade through a sea of undesirable male users and target a particular man who reacted exactly as Mr. Mellesmoen predicted: pausing on her profile and giving it more than the glancing consideration he had been giving potential matches before her in his queue, matching with her, and enhancing her user experience just as Mr. Mellesmoen anticipated. Indeed, Tinder reports that Super Like has resulted in a substantial rise in female subscribers to the service.

Tinder also adopted the "psychological" language of Mr. Mellesmoen's pitch, touting the ability of the feature to result in meaningful interactions between users. Tinder has described "super likes" as "special," in part because users are limited in how many they may use. Tinder has regularly pronounced that a "super like" is three times more likely to result in a match, thereby increasing Tinder's match rate, and that subsequent conversations between the matched users last 70% longer than non-super liked matches. Just as Mr. Mellesmoen explained, Super Like lets users know "that they stand out from everyone else." A "super liked" profile gets "noticed." Mr. Rad himself has adopted Mr. Mellesmoen's analogies in interviews, lifted directly from their conversation at the pitch meeting, describing Super Like as the difference between a glance across a room and "going over and buying [someone] a drink."

Finally, the company has monetized Super Like in line with Mr. Mellesmoen's recommendations, making "super likes" part of a pre-purchased package and limiting their number.

By Tinder's own admission, Super Like has been an incredible boon to the company, increasing revenue through paid subscriptions and enabling the company to avoid over-reliance on paid advertising. Yet, despite his "word" that the company would compensate Mr. Mellesmoen for his idea, Mr. Rad has never contacted Mr. Mellesmoen. In fact, Mr. Rad has actively avoided contact with Mr. Mellesmoen, claiming, incredibly, that he had thought of "Super Like" "months" before meeting with Mr. Mellesmoen. However, even this convenient, *post hoc* position is in stark contrast to Mr. Rad's public claim that a disgraced colleague thought of the idea "three years" before its launch. Mr. Rad's attempt to rewrite history does not withstand scrutiny.

## II. Tinder's Legal Exposure

It should not be surprising that California has developed robust legal protections for creatives. California law is well-developed with respect to the wrongdoing described above and Tinder faces substantial legal exposure as a result of its misappropriation of Mr. Mellesmoen's idea. In addition to a wealth of ordinary common law claims, including but not limited to fraud, promissory estoppel, quantum meruit, misrepresentation, and unjust enrichment, Mr. Mellesmoen has a compelling "idea submission" claim for which the law provides substantial damages.

California has long enabled plaintiffs to recover the value of a purloined idea via express or implied contract. In order to plead a cause of action for breach of contract under these circumstances, the plaintiff need only allege that: (a) she conditioned her offer to disclose her idea to the defendant on the defendant's express promise to pay for the idea if the defendant used it; (b) the defendant, knowing the condition before the idea was disclosed, voluntarily accepted its disclosure; and (c) the defendant found the idea valuable and used it. *Desny v. Wilder*, 299 P.2d 257, 270 (Cal. 1956). The idea need not be novel, or one which the defendant could not have come up with on his own, to be protected. *See Blaustein v. Burton*, 88 Cal. Rptr. 319, 334 (Cal. Ct. App. 1970).

An inference of "use" will arise if the ultimate product at issue is "substantially similar" to the idea. *See Sutton v. Walt Disney Prods.*, 110 Cal. App. 2d 298, 603 (1953). "Substantial similarity" between an idea and a product will be found where they share factual features and portrayal techniques; it is of no consequence that implementation differs from concept where a "substantial element" of the idea remains intact. *See, e.g., Fink v. Goodman-Todman Enters., Ltd.*, 88 Cal. Rptr. 679, 691–92 (Cal. Ct. App. 1970). This is especially true where there is no question that the defendant had access to the idea. *Id.*, at 692; *see, e.g., Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 630–32 (9th Cir. 2010). Whether an idea and an ultimate product are

February 16, 2016
Page 6

"similar" presents a question of fact resolved "without dissection and without expert or elaborative analysis," but instead by "the common knowledge of the average reader, observer, spectator, or listener." *Stanley v. Columbia Broadcasting Sys.*, 221 P.2d 73, 77 (Cal. 1950); *Klekas*, 198 Cal. Rptr. 296, 302 (Cal. Ct. App. 1984); *see also Mann v. Columbia Pictures, Inc.*, 180 Cal. Rptr. 522 (Cal. Ct. App. 1982).

While a defendant can overcome an "idea submission" case if it can prove that it independently developed the product at issue without knowledge of or reliance on the plaintiff's idea, an inference of "use" is difficult to rebut. In the typical case, a defendant must demonstrate that he lacked <u>any</u> reasonable access to the idea. *See, e.g., Spinner v. Am. Broadcasting Cos., Inc.*, 155 Cal. Rptr. 3d 32, 42–45 (Cal. Ct. App. 2013). Or, he must present substantial evidence establishing that conception and development of the product predated receipt of the idea and was not even subsequently influenced by it. *See, e.g., Teich v. General Mills, Inc.*, 339 P.2d 627, 632–34 (Cal. Ct. App. 1959). Such defenses often raise credibility issues and general disputes of fact that preclude summary judgment, even when such cases are brought in federal courts. *See, e.g., Miller v. Miramax Film Corp.*, No. CV-9-08526, 2001 U.S. Dist. LEXIS 25976, at *31 (C.D. Cal. Sept. 26, 2001). Absent "evidence of independent creation that is 'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved,'" an "idea submission" case will proceed to trial. *Spinner*, 155 Cal. Rptr. at 42 (citations omitted); *see, e.g., Gunther-Wahl Prods. Inc. v. Mattel, Inc.*, 128 Cal. Rptr. 2d 50 (Cal. Ct. App. 2002).

The outcome in *Concept Chaser Co. v. Pentel of America* starkly illustrates Tinder's legal exposure. No. B241929, 2014 Cal. App. Unpub. LEXIS 3786 (Cal. Ct. App. May 27, 2014). The plaintiff in *Concept Chaser* was an advertising agency approached by the defendant manufacturer to develop a marketing concept for a new pen. *Id.*, at *6. The parties entered into a contract prohibiting the manufacturer from using any of the agency's ideas without compensation. *Id.*, at **6–7. Thereafter, the agency presented a well-received marketing plan. *Id.*, at **10–11. However, despite the manufacturer's obligation to compensate the agency for use of the plan, the manufacturer abruptly ceased negotiations with the agency to implement the idea and instead pirated the idea for its own use. *Id.*, at **13–14. A jury subsequently found for the agency on its breach of contract and fraud claims and the court entered judgment for more than $15,500,000. *Id.*, at **16–17. The liability finding was affirmed on appeal and the parties ultimately agreed to a seven-figure settlement. *Id.*, at *24, *31

Substantial damages for breach of contract in "idea submission" cases are common. It is well-settled that "[c]ontract damages under California law are designed to provide as nearly as possible the equivalent of the benefits of performance." *Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1198 (9th Cir. 1986) (citation omitted). Accordingly, the terms of an implied contract—as found by the factfinder—will be strictly enforced. *Id.* To that end, a plaintiff can expect to recover the market value—or even profits earned—as a result of her idea. For example, in *Landsberg v. Scrabble Crossword Game Players, Inc.*, the defendant was found to have breached an implied contract when it improperly purloined the plaintiff's idea for a Scrabble© strategy guide. 802 F.2d at 1196–97. The court found that the implied contract

February 16, 2016
Page 7

required the defendant to compensate the plaintiff for his idea or refrain from using it altogether. *Id.*, at 1198. Because the plaintiff was entitled to deny the defendant permission to use his idea at all, and to exploit his idea through other means, the defendant's breach denied him the "opportunity to market his work as he saw fit." *Id.* Under those circumstances, the plaintiff was entitled to recover the defendant's profits from its unlawful use of the idea. *Id.*

Additionally, California provides for punitive damages in an "idea submission" case, as well as attorneys' fees, costs of suit, and prejudgment interest. *Id.*, at 1199 (citing *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co. of Cal.*, 686 P.2d 1158 (Cal. 1984)) & 1200–01. Tinder's potential liability is substantial.

Mr. Mellesmoen can easily state an "idea submission" claim that a jury will find persuasive and for which Mr. Mellesmoen will recover considerable damages. As detailed above, prior to disclosing the "Really Like" idea to Mr. Rad, Mr. Mellesmoen made clear his requirement that any use of the idea be compensated by Tinder via a percentage of revenue derived therefrom. *See Desny*, 299 P.2d at 270. Mr. Rad acknowledged Mr. Mellesmoen's terms and, knowing those terms, voluntarily accepted disclosure of the idea. *Id.* Mr. Rad expressed the value of the idea directly to Mr. Mellesmoen during the pitch meeting, stating that the idea was novel and exciting, and then proceeded as Tinder's CEO to utilize the idea in substantially the same form presented by Mr. Mellesmoen. *Id.* Tinder also appropriated Mr. Mellesmoen's marketing narrative whole cloth and has promoted "Super Like" in the very fashion Mr. Mellesmoen proposed, achieving the very results Mr. Mellesmoen predicted. Indeed, recognizing the value in Mr. Mellesmoen's idea, Tinder timed its launch of "Super Like" just weeks before its IPO.

Any *post hoc* efforts by Tinder to claim independent creation will not withstand scrutiny. Mr. Rad's statements to Mr. Mellesmoen during the pitch meeting that Mr. Rad had not thought of the "Really Like" idea before Mr. Mellesmoen proposed it, that he found Mr. Mellesmoen's approach to expanding Tinder's business useful and unprecedented, and the very fact that the simple 10-minute pitch meeting quadrupled in duration will easily undermine any claim by Tinder that it has the "clear, positive, and uncontradicted evidence of independent creation" necessary to keep Mr. Mellesmoen's case from a jury.

Mr. Mellesmoen is bright, thoughtful, and engaging. Once before a jury, we have no doubt that jurors will find him to be a compelling and credible witness. We are equally confident that a jury would be unmoved by Mr. Rad, would question his credibility, and would be as unimpressed with his business ethics as have been the many journalists who have documented his history of personal and professional misconduct. In short, Tinder's malicious and bad faith refusal to compensate Mr. Mellesmoen for his valuable idea is unlawful, wrong, and entitles Mr. Mellesmoen to substantial recovery.

\*          \*          \*          \*

February 16, 2016
Page 8

  California judges and juries are familiar with the underhanded business tactics described in this letter and sympathetic to plaintiffs such as Mr. Mellesmoen—especially in light of the reputation of players on the other side. Indeed, in just the last few weeks, yet another media report of Mr. Rad's questionable business practices and history of making false promises received widespread attention. *See* Nellie Bowles, *Mr. (Swipe) Right?*, CALIFORNIA SUNDAY MAGAZINE, Jan. 11, 2106, *available at* https://story.californiasunday.com/sean-rad-tinder?.

  This letter is an attempt to amicably resolve Mr. Mellesmoen's legal claims, confidentially and without media exposure. We invite you to contact us after you have an opportunity to review this letter and confer with Mr. Rad, who we trust will confirm that the facts stated above are true. However, should you disagree with the facts stated herein, please promptly let us know what you believe is inaccurate, in writing and under oath, and provide any documents that you believe support your view of the facts.

  Additionally, please note that this is a formal notification of potential litigation against Tinder. Accordingly, we caution you to be aware of your and your company's preservation obligations under applicable law. *See, e.g., Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006); *Cedars-Sinai Med. Ctr. v. Superior Court*, 18 Cal. 4th 1 (1998). Should litigation become necessary, we will carefully follow up to ensure that these obligations were fulfilled and will pursue all available remedies if they were not.

  While Mr. Mellesmoen's time is valuable and he would prefer to avoid a protracted lawsuit, should good faith attempts to resolve this matter not commence within 14 days of the date of this correspondence, Mr. Mellesmoen will proceed vigorously with litigation and take other appropriate actions to vindicate his rights.

               Respectfully,

               Shannon A. Lang

SAL/
cc: Mitch Mosvick, Esq., Mosvick Legal East, LLC (*by e-mail only*)
   John Mellesmoen, Innovate CoLab LLC (*by e-mail only*)